## MAINE ET AL. *v.* THIBOUTOT ET VIR.

No. 79–838.   Argued April 22, 1980—Decided June 25, 1980

BRENNAN, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 11.

*James Eastman Smith,* Assistant Attorney General of Maine, argued the cause for petitioners. With him on the briefs was *Richard S. Cohen,* Attorney General.

*Robert Edmond Mittel* argued the cause for respondents. With him on the brief were *Susan Calkins* and *Hugh Calkins.**

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The case presents two related questions arising under 42 U. S. C. §§ 1983 and 1988. Respondents brought this suit in the Maine Superior Court alleging that petitioners, the State of Maine and its Commissioner of Human Services, violated § 1983 by depriving respondents of welfare benefits

---

*A brief of *amici curiae* urging reversal was filed by *Edward G. Biester, Jr.,* Attorney General, and *Robert E. Kelly* and *Allen C. Warshaw,* Deputy Attorneys General, for the Commonwealth of Pennsylvania, joined by officials for their respective States as follows: *Francis X. Bellotti,* Attorney General of Massachusetts, and *Garrick F. Cole,* Assistant Attorney General; *John J. Degnan,* Attorney General of New Jersey, and *Andrea Silkowitz,* Deputy Attorney General; *Thomas D. Rath,* Attorney General of New Hampshire; *M. Jerome Diamond,* Attorney General of Vermont, and *Benson Scotch,* Assistant Attorney General; *Dennis J. Roberts II,* Attorney General of Rhode Island, *Allen P. Rubine,* Deputy Attorney General, and *John S. Foley* and *Eileen G. Cooney,* Special Assistant Attorneys General; and *Richard S. Gebelein,* Attorney General of Delaware, and *Regina M. Small,* State Solicitor.

Briefs of *amici curiae* urging affirmance were filed by *Bruce J. Ennis* for the American Civil Liberties Union et al.; and by *Carol Goodman* for the Volunteer Lawyers Project of the Boston Bar Association et al.

to which they were entitled under the federal Social Security Act, specifically 42 U. S. C. § 602 (a)(7). The petitioners present two issues: (1) whether § 1983 encompasses claims based on purely statutory violations of federal law, and (2) if so, whether attorney's fees under § 1988 may be awarded to the prevailing party in such an action.[1]

## I

Respondents, Lionel and Joline Thiboutot, are married and have eight children, three of whom are Lionel's by a previous marriage. The Maine Department of Human Services notified Lionel that, in computing the Aid to Families with Dependent Children (AFDC) benefits to which he was entitled for the three children exclusively his, it would no longer make allowance for the money spent to support the other five children, even though Lionel is legally obligated to support them. Respondents, challenging the State's interpretation of 42 U. S. C. § 602 (a)(7), exhausted their state administrative remedies and then sought judicial review of the administrative action in the State Superior Court. By amended complaint, respondents also claimed relief under § 1983 for themselves and others similarly situated. The Superior Court's judgment enjoined petitioners from enforcing the challenged rule and ordered them to adopt new regulations, to notify class members of the new regulations, and to pay the correct amounts retroactively to respondents and prospectively to eligible class members.[2] The court, however, denied respondents' motion for attorney's fees. The Supreme Judicial Court of Maine, 405 A. 2d 230 (1979), concluded that re-

---

[1] Petitioners also argue that jurisdiction to hear § 1983 claims rests exclusively with the federal courts. Any doubt that state courts may also entertain such actions was dispelled by *Martinez* v. *California,* 444 U. S. 277, 283–284, n. 7 (1980). There, while reserving the question whether state courts are *obligated* to entertain § 1983 actions, we held that Congress has not barred them from doing so.

[2] The State did not appeal the judgment against it.

4

spondents had no entitlement to attorney's fees under state law, but were eligible for attorney's fees pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 90 Stat. 2641, 42 U. S. C. § 1988.[3]  We granted certiorari.  444 U. S. 1042 (1980).  We affirm.

## II

Section 1983 provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution *and laws,* shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  (Emphasis added.)

The question before us is whether the phrase "and laws," as used in § 1983, means what it says, or whether it should be limited to some subset of laws.  Given that Congress attached no modifiers to the phrase, the plain language of the statute undoubtedly embraces respondents' claim that petitioners violated the Social Security Act.

Even were the language ambiguous, however, any doubt as to its meaning has been resolved by our several cases suggesting, explicitly or implicitly, that the § 1983 remedy broadly encompasses violations of federal statutory as well as constitutional law.  *Rosado* v. *Wyman,* 397 U. S. 397 (1970), for example, "held that suits in federal court under § 1983 are proper to secure compliance with the provisions of the Social Security Act on the part of participating States." *Edelman* v. *Jordan,* 415 U. S. 651, 675 (1974).  *Monell* v. *New York*

---

[3] The Supreme Judicial Court remanded to allow the Superior Court to exercise its discretion under § 1988 to determine the appropriate disposition of the fee request.

*City Dept. of Social Services,* 436 U. S. 658, 700–701 (1978), as support for its conclusion that municipalities are "persons" under § 1983, reasoned that "there can be no doubt that § 1 of the Civil Rights Act [of 1871] was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights." Similarly, *Owen* v. *City of Independence,* 445 U. S. 622, 649 (1980), in holding that the common-law immunity for discretionary functions provided no basis for according municipalities a good-faith immunity under § 1983, noted that a court "looks only to whether the municipality has conformed to the requirements of the Federal Constitution and statutes." *Mitchum* v. *Foster,* 407 U. S. 225, 240, n. 30 (1972), and *Lynch* v. *Household Finance Corp.,* 405 U. S. 538, 543, n. 7 (1972), noted that § 1983's predecessor "was enlarged to provide protection for rights, privileges, or immunities secured by federal law." *Greenwood* v. *Peacock,* 384 U. S. 808, 829–830 (1966), observed that under § 1983 state "officers may be made to respond in damages not only for violations of rights conferred by federal equal civil rights laws, but for violations of other federal constitutional and statutory rights as well." The availability of this alternative sanction helped support the holding that 28 U. S. C. § 1443 (1) did not permit removal to federal court of a state prosecution in which the defense was that the state law conflicted with the defendants' federal rights. As a final example, Mr. Justice Stone, writing in *Hague* v. *CIO,* 307 U. S. 496,. 525–526 (1939), expressed the opinion that § 1983 was the product of an "exten[sion] to include rights, privileges and immunities secured by the laws of the United States as well as by the Constitution."

While some might dismiss as dictum the foregoing statements, numerous and specific as they are, our analysis in several § 1983 cases involving Social Security Act (SSA) claims has relied on the availability of a § 1983 cause of action for statutory claims. Constitutional claims were also raised

6

in these cases, providing a jurisdictional base, but the statutory claims were allowed to go forward, and were decided on the merits, under the court's pendent jurisdiction. In each of the following cases § 1983 was necessarily the exclusive statutory cause of action because, as the Court held in *Edelman* v. *Jordan,* 415 U. S., at 673–674; *id.,* at 690 (MARSHALL, J., dissenting), the SSA affords no private right of action against a State. *Miller* v. *Youakim,* 440 U. S. 125, 132, and n. 13 (1979) (state foster care program inconsistent with SSA); *Quern* v. *Mandley,* 436 U. S. 725, 729, and n. 3 (1978) (state emergency assistance program consistent with SSA); *Van Lare* v. *Hurley,* 421 U. S. 338 (1975) (state shelter allowance provisions inconsistent with SSA); *Townsend* v. *Swank,* 404 U. S. 282 (1971) (state prohibition against AFDC aid for college students inconsistent with SSA); *King* v. *Smith,* 392 U. S. 309, 311 (1968) (state cohabitation prohibition inconsistent with SSA). Cf. *Hagans* v. *Lavine,* 415 U. S. 528, 532–533, 543 (1974) (District Court had jurisdiction to decide whether state recoupment provisions consistent with SSA); *Carter* v. *Stanton,* 405 U. S. 669, 670 (1972) (District Court had jurisdiction to decide whether state absent-spouse rule consistent with SSA).

In the face of the plain language of § 1983 and our consistent treatment of that provision, petitioners nevertheless persist in suggesting that the phrase "and laws" should be read as limited to civil rights or equal protection laws.[4] Petitioners suggest that when § 1 of the Civil Rights Act of 1871, 17 Stat. 13, which accorded jurisdiction and a remedy for deprivations of rights secured by "the Constitution of the United States," was divided by the 1874 statutory revision into a remedial section, Rev. Stat. § 1979, and jurisdictional

---

[4] Where the plain language, supported by consistent judicial interpretation, is as strong as it is here, ordinarily "it is not *necessary* to look beyond the words of the statute." *TVA* v. *Hill,* 437 U. S. 153, 184, n. 29 (1978).

sections, Rev. Stat. §§ 563 (12) and 629 (16), Congress intended that the same change made in § 629 (16) be made as to each of the new sections as well. Section 629 (16), the jurisdictional provision for the circuit courts and the model for the current jurisdictional provision, 28 U. S. C. § 1343 (3), applied to deprivations of rights secured by "the Constitution of the United States, or of any right secured by any law providing for equal rights." On the other hand, the remedial provision, the predecessor of § 1983, was expanded to apply to deprivations of rights secured by "the Constitution and laws," and § 563 (12), the provision granting jurisdiction to the district courts, to deprivations of rights secured by "the Constitution of the United States, or of any right secured by any law of the United States."

We need not repeat at length the detailed debate over the meaning of the scanty legislative history concerning the addition of the phrase "and laws." See *Chapman* v. *Houston Welfare Rights Organization,* 441 U. S. 600 (1979); *id.,* at 623 (POWELL, J., concurring); *id.,* at 646 (WHITE, J., concurring in judgment); *id.,* at 672 (STEWART, J., dissenting). One conclusion which emerges clearly is that the legislative history does not permit a definitive answer. *Id.,* at 610–611; *id.,* at 674 (STEWART, J., dissenting). There is no express explanation offered for the insertion of the phrase "and laws." On the one hand, a principal purpose of the added language was to "ensure that federal legislation providing specifically for equality of rights would be brought within the ambit of the civil action authorized by that statute." *Id.,* at 637 (POWELL, J., concurring). On the other hand, there are no indications that that was the only purpose, and Congress' attention was specifically directed to this new language. Representative Lawrence, in a speech to the House of Representatives that began by observing that the revisers had very often changed the meaning of existing statutes, 2 Cong. Rec. 825 (1874), referred to the civil rights statutes as "possibly [showing] ver-

8

bal modifications bordering on legislation," *id.*, at 827. He went on to read to Congress the original and revised versions. In short, Congress was aware of what it was doing, and the legislative history does not demonstrate that the plain language was not intended.[5] Petitioners' arguments amount to the claim that had Congress been more careful, and had it fully thought out the relationship among the various sections,[6] it might have acted differently. That argument, however, can best be addressed to Congress, which, it is important to note, has remained quiet in the face of our many pronouncements on the scope of § 1983. Cf. *TVA* v. *Hill,* 437 U. S. 153 (1978).

## III

Petitioners next argue that, even if this claim is within § 1983, Congress did not intend statutory claims to be covered by the Civil Rights Attorney's Fees Awards Act of 1976,

---

[5] In his concurring opinion in *Chapman* v. *Houston Welfare Rights Organization,* 441 U. S. 600 (1979), MR. JUSTICE POWELL's argument proceeds on the basis of the flawed premise that Congress did not intend to change the meaning of existing laws when it revised the statutes in 1874. He assumed that Congress had instructed the revisers not to make changes, and that the revisers had obeyed those instructions. In fact, the second section of the statute creating the Revision Commission, 14 Stat. 75, mandated that the commissioners "mak[e] such alterations as may be necessary to reconcile the contradictions, supply the omissions, and amend the imperfections of the original text." Furthermore, it is clear that Congress understood this mandate to authorize the Commission to do more than merely "copy and arrange in proper order, and classify in heads the actual text of statutes in force." 2 Cong. Rec. 825 (1874). We have already decided that the "customary stout assertions of the codifiers that they had merely clarified and reorganized without changing substance" cannot be taken at face value. *United States* v. *Price,* 383 U. S. 787, 803 (1966) (holding that the revisers significantly broadened the forerunner of 18 U. S. C. § 242).

[6] There is no inherent illogic in construing § 1983 more broadly than § 1343 (3) was construed in *Chapman* v. *Houston Welfare Rights Organization, supra.* It would only mean that there are statutory rights which Congress has decided cannot be enforced in the federal courts unless 28 U. S. C. § 1331 (a)'s $10,000 jurisdictional amount is satisfied.

which added the following sentence to 42 U. S. C. § 1988 (emphasis added):

"In *any action* or proceeding *to enforce* a provision of sections 1981, 1982, *1983,* 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U. S. C. 1681 et seq.] or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or title VI of the Civil Rights Act of 1964 [42 U. S. C. 2000d et seq.], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

Once again, given our holding in Part II, *supra,* the plain language provides an answer. The statute states that fees are available in *any* § 1983 action. Since we hold that this statutory action is properly brought under § 1983, and since § 1988 makes no exception for statutory § 1983 actions, § 1988 plainly applies to this suit.[7]

The legislative history is entirely consistent with the plain language. As was true with § 1983, a major purpose of the Civil Rights Attorney's Fees Awards Act was to benefit those claiming deprivations of constitutional and civil rights. Principal sponsors of the measure in both the House and the Senate, however, explicitly stated during the floor debates that the statute would make fees available more broadly. Represent-

_____

[7] The States appearing as *amici* suggest that *Hutto* v. *Finney,* 437 U. S. 678 (1978), left open the issue whether Congress, exercising its power under § 5 of the Fourteenth Amendment, could set aside the States' Eleventh Amendment immunity in statutory as opposed to constitutional cases. *Hutto,* however, concluded alternatively that the Eleventh Amendment did not bar attorney's fee awards in federal courts because the fee awards are part of costs, which "have traditionally been awarded without regard for the State's Eleventh Amendment immunity." *Id.,* at 695. No Eleventh Amendment question is present, of course, where an action is brought in a state court since the Amendment, by its terms, restrains only "[t]he Judicial power of the United States."

10

ative Drinan explained that the Act would apply to § 1983 and that § 1983 "authorizes suits against State and local officials based upon Federal statutory as well as constitutional rights. For example Blue against Craig, 505 F. 2d 830 (4th Cir. 1974)." 122 Cong. Rec. 35122 (1976).[8] Senator Kennedy also included an SSA case as an example of the cases "enforc[ing] the rights promised by Congress or the Constitution" which the Act would embrace.[9] Id., at 33314.[10] In short, there can be no question that Congress passed the Fees Act anticipating that it would apply to statutory § 1983 claims.

Several States, participating as amici curiae, argue that even if § 1988 applies to § 1983 claims alleging deprivations of statutory rights, it does not apply in state courts. There is no merit to this argument.[11] As we have said above, Mar-

---

[8] In Blue v. Craig, the plaintiffs claimed that North Carolina's Medicaid plan was inconsistent with the SSA.

[9] "In a case now pending, officials accepted Social Security Act funds for years for certain medical screening programs when in fact they had no such programs in most of the State. Bond v. Stanton, 528 F. 2d 688 (7th Cir. 1976)." 122 Cong. Rec. 33314 (1976). In the same list of examples, Senator Kennedy included La Raza Unida v. Volpe, 57 F. R. D. 94 (ND Cal. 1972), in which plaintiffs demonstrated violations of "the Department of Transportation Act of 1966 and various sections of 23 U. S. C. dealing with housing displacement and relocation." Id., at 95.

[10] The Committee Reports are in accord. The Senate Report recognized that actions under § 1983 covered by the Act would include suits "redressing violations of the Federal Constitution or laws." S. Rep. No. 94–1011, p. 4 (1976). The House Report, after suggesting that a party prevailing on a claim which could not support a fee award should be entitled to a determination on an attached claim covered by § 1988 in order to determine eligibility for fees, recognizes that a special problem is presented because "[i]n some instances . . . the claim with fees may involve a constitutional question. . . ." H. R. Rep. No. 94–1558, p. 4, n. 7 (1976). The negative pregnant is that in other instances the claim with fees need not involve a constitutional question.

[11] The state courts which have addressed this issue have reached that same result. 405 A. 2d 230, 239 (Me. 1979) (case below); Ramirez v.

*tinez* v. *California,* 444 U. S. 277 (1980), held that § 1983 actions may be brought in state courts. Representative Drinan described the purpose of the Civil Rights Attorney's Fees Awards Act as "authoriz[ing] the award of a reasonable attorney's fee in actions brought in State or Federal courts." 122 Cong. Rec. 35122 (1976). And Congress viewed the fees authorized by § 1988 as "an integral part of the remedies necessary to obtain" compliance with § 1983. S. Rep. No. 94–1011, p. 5 (1976). It follows from this history and from the Supremacy Clause that the fee provision is part of the § 1983 remedy whether the action is brought in federal or state court.[12]

*Affirmed.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

The Court holds today, almost casually, that 42 U. S. C. § 1983 creates a cause of action for deprivations under color of state law of any federal statutory right. Having transformed purely statutory claims into "civil rights" actions under § 1983, the Court concludes that 42 U. S. C. § 1988 per-

---

*County of Hudson,* 169 N. J. Super. 455, 404 A. 2d 1271 (1979); *Tobeluk* v. *Lind,* 589 P. 2d 873 (Alaska 1979); *Young* v. *Toia,* 66 App. Div. 2d 377, 413 N. Y. S. 2d 530 (1979); *Lange* v. *Nature Conservancy, Inc.,* 24 Wash. App. 416, 422, 601 P. 2d 963, 967 (1979); *Board of Trustees* v. *Holso,* 584 P. 2d 1009 (Wyo. 1978); *Thorpe* v. *Durango School District,* 41 Colo. App. 473, 591 P. 2d 1329 (1978), cert. granted by Colorado Supreme Court (1979).

[12] If fees were not available in state courts, federalism concerns would be raised because most plaintiffs would have no choice but to bring their complaints concerning state actions to federal courts. Moreover, given that there is a class of cases stating causes of action under § 1983 but not cognizable in federal court absent the $10,000 jurisdictional amount of § 1331 (a), see n. 6, *supra,* some plaintiffs would be forced to go to state courts, but contrary to congressional intent, would still face financial disincentives to asserting their claimed deprivations of federal rights.

mits the "prevailing party" to recover his attorney's fees. These two holdings dramatically expand the liability of state and local officials and may virtually eliminate the "American Rule" in suits against those officials.

The Court's opinion reflects little consideration of the consequences of its judgment. It relies upon the "plain" meaning of the phrase "and laws" in § 1983 and upon this Court's assertedly "consistent treatment" of that statute. *Ante,* at 4, 6. But the reading adopted today is anything but "plain" when the statutory language is placed in historical context. Moreover, until today this Court never had held that § 1983 encompasses all purely statutory claims. Past treatment of the subject has been incidental and far from consistent. The only firm basis for decision is the historical evidence, which convincingly shows that the phrase the Court now finds so clear was—and remains—nothing more than a shorthand reference to equal rights legislation enacted by Congress. To read "and laws" more broadly is to ignore the lessons of history, logic, and policy.

Part I of this opinion examines the Court's claim that it only construes the "plain meaning" of § 1983, while Part II reviews the historical evidence on the enactment. Part III considers the practical consequences of today's decision. The final substantive section demonstrates that this Court's precedents do not support the Court's ruling today.

# I

Section 1983 provides in relevant part that "[e]very person who, under color of [state law,] subjects . . . any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . ." The Court asserts that "the phrase 'and laws' . . . means what it says," because "Congress attached no modifiers to the phrase. . . ." *Ante,* at 4. Finding no "definitive" contrary indications in the legislative history of § 1983, the Court concludes that that statute provides a

remedy for violations of the Social Security Act. The Court suggests that those who would read the phrase "and laws" more narrowly should address their arguments to Congress. *Ante,* at 8.

If we were forbidden to look behind the language in legislative enactments, there might be some force to the suggestion that "and laws" must be read to include all federal statutes. *Ante,* at 4.[1] But the "plain meaning" rule is not as inflexible as the Court imagines. Although plain meaning is always the starting point, *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring), this Court rarely ignores available aids to statutory construction. See, *e. g., Cass* v. *United States,* 417 U. S. 72, 77–79 (1974); *Harrison* v. *Northern Trust Co.,* 317 U. S. 476, 479 (1943), quoting *United States* v. *American Trucking Assns., Inc.,* 310 U. S. 534, 543–544 (1940). We have recognized consistently that statutes are to be interpreted " 'not only by a considera-

---

[1] The "plain meaning" of "and laws" may be more elusive than the Court admits. One might expect that a statute referring to all rights secured either by the Constitution or by the laws would employ the disjunctive "or." This is precisely what Congress did in the only Civil Rights Act that referred to laws when it was originally enacted. Act of May 31, 1870, § 6, 16 Stat. 141 (now codified at 18 U. S. C. § 241). That statute created criminal penalties for conspiracy to deprive persons of rights secured by "the Constitution *or* laws." *Ibid.* (emphasis added). Five years later, when Congress enacted a statute providing for general federal-question jurisdiction, it described matters "arising under the Constitution *or* laws." Act of Mar. 3, 1875, § 1, 18 Stat. 470 (emphasis added) (now codified at 28 U. S. C. § 1331).

In contrast, a natural reading of the conjunctive "and" in § 1983 would require that the right at issue be secured both by the Constitution and by the laws. In 1874, this would have included the rights set out in the Civil Rights Act of 1866, which had been incorporated in the Fourteenth Amendment and re-enacted in the Civil Rights Act of 1870. See Gressman, The Unhappy History of Civil Rights Legislation, 50 Mich. L. Rev. 1323, 1329, 1333–1334 (1952). The legislative history does not suggest that the Court should adopt such a limited construction. But an advocate of "plain meaning" hardly can ignore the ambiguity.

tion of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed.' " *District of Columbia* v. *Carter,* 409 U. S. 418, 420 (1973), quoting *Puerto Rico* v. *Shell Co.,* 302 U. S. 253, 258 (1937); see generally *TVA* v. *Hill,* 437 U. S. 153, 204–205, and n. 14 (1978) (POWELL, J., dissenting).

The rule is no different when the statute in question is derived from the civil rights legislation of the Reconstruction Era. Those statutes "must be given the meaning and sweep" dictated by "their origins and their language"—not their language alone. *Lynch* v. *Household Finance Corp.,* 405 U. S. 538, 549 (1972). When the language does not reflect what history reveals to have been the true legislative intent, we have readily construed the Civil Rights Acts to include words that Congress inadvertently omitted. See *Examining Board* v. *Flores de Otero,* 426 U. S. 572, 582–586 (1976) (interpreting 28 U. S. C. § 1343 (3) to confer jurisdiction upon territorial courts). Thus, "plain meaning" is too simplistic a guide to the construction of § 1983.

Blind reliance on plain meaning is particularly inappropriate where, as here, Congress inserted the critical language without explicit discussion when it revised the statutes in 1874. See *ante,* at 6–7. Indeed, not a single shred of evidence in the legislative history of the adoption of the 1874 revision mentions this change. Since the legislative history also shows that the revision generally was not intended to alter the meaning of existing law, see Part II, *infra,* this Court previously has insisted that apparent changes be scrutinized with some care. As Mr. Justice Holmes observed, the Revised Statutes are "not lightly to be read as making a change. . . ." *United States* v. *Sischo,* 262 U. S. 165, 168–169 (1923).

## II

The origins of the phrase "and laws" in § 1983 were discussed in detail in two concurring opinions last Term. Com-

pare *Chapman* v. *Houston Welfare Rights Org.*, 441 U. S. 600, 623 (1979) (POWELL, J., concurring), with *id.*, at 646 (WHITE, J., concurring in judgment). I shall not recount the full historical evidence presented in my *Chapman* opinion. Nevertheless, the Court's abrupt dismissal of the proposition that "Congress did not intend to change the meaning of existing laws when it revised the statutes in 1874," *ante,* at 8, n. 5, reflects a misconception so fundamental as to require a summary of the historical record.

## A

Section 1983 derives from § 1 of the Civil Rights Act of 1871, which provided a cause of action for deprivations of constitutional rights only. "Laws" were not mentioned. Act of Apr. 20, 1871, 17 Stat. 13. The phrase "and laws" was added in 1874, when Congress consolidated the laws of the United States into a single volume under a new subject-matter arrangement. See 2 Cong. Rec. 827 (Jan. 21, 1874) (remarks of Rep. Lawrence). Consequently, the intent of Congress in 1874 is central to this case.

In addition to creating a cause of action, § 1 of the 1871 Act conferred concurrent jurisdiction upon "the district or circuit courts of the United States. . . ." 17 Stat. 13. In the 1874 revision, the remedial portion of § 1 was codified as § 1979 of the Revised Statutes, which provided for a cause of action in terms identical to the present § 1983. The jurisdictional portion of § 1 was divided into § 563 (12), conferring district court jurisdiction, and § 629 (16), conferring circuit court jurisdiction. Although §§ 1979, 563 (12), and 629 (16) came from the same source, each was worded differently. Section 1979 referred to deprivations of rights "secured by the Constitution and laws"; § 563 (12) described rights secured "by the Constitution of the United States, or . . . by any law of the United States"; and § 629 (16) encompassed rights secured "by the Constitution of the United States, or . . . by any law providing for equal rights of citizens of the United

16

States." [2] When Congress merged the jurisdiction of circuit and district courts in 1911, the narrower language of § 629 (16) was adopted and ultimately became the present 28 U. S. C. § 1343 (3). Act of Mar. 3, 1911, § 24 (14), 36 Stat. 1092.[3]

## B

In my view, the legislative history unmistakably shows that the variations in phrasing introduced in the 1874 revision were inadvertent, and that each section was intended to have precisely the same scope. *Chapman* v. *Houston Welfare Rights Org., supra,* at 631–640 (POWELL, J., concurring). Moreover, the only defensible interpretation of the contemporaneous legislative record is that the reference to "laws" in each section was intended "to do no more than ensure that federal legislation providing specifically for equality of rights would be brought within the ambit of the civil action authorized by [§ 1979]." 441 U. S., at 637. Careful study of the available materials leaves no serious doubt that the Court's contrary conclusion is completely at odds with the intent of Congress in 1874. *Id.,* at 640.

---

[2] The 1874 revision also drew a third jurisdictional provision from § 1 of the 1871 Act. That provision authorized review in this Court, without regard to the amount in controversy, of "[a]ny final judgment . . . in any case brought on account of the deprivation of any right, privilege, or immunity secured by the Constitution of the United States, or of any right or privilege of a citizen of the United States." Rev. Stat. § 699 (4). Thus, § 1 actually became four separate statutes in 1874. In the Court's view, Congress intended to broaden the remedial and district court jurisdictional provisions to encompass violations of *all* laws, while simultaneously restricting circuit court jurisdiction to "laws providing for equal rights." Although the Court does not mention § 699 (4), that statute is not easily read to encompass rights secured by any federal law. Thus, the Court attributes to Congress an intention to create a new class of civil rights claims which could be litigated in district but not circuit courts, and without any right of review in this Court. I would not assume that Congress intended such senseless jurisdictional results.

[3] Section 563 (12) did not survive the 1911 revision.

The Court holds today that the foregoing reasoning is based on a "flawed premise," because Congress instructed the Revision Commission to change the statutes in certain respects. *Ante,* at 8, n. 5; Act of June 27, 1866, § 2, 14 Stat. 75. But it is the Court's premise that is flawed. The Revision Commission, which worked for six years on the project, submitted to Congress a draft that did contain substantive changes.[4] But a Joint Congressional Committee, which was appointed in early 1873 to transform the draft into a bill, concluded that it would be "utterly impossible to carry the measure through, if it was understood that it contained new legislation." 2 Cong. Rec. 646 (Jan. 14, 1874) (remarks of Rep. Poland); see Act of Mar. 3, 1873, 17 Stat. 579. Therefore, the Committee employed Thomas Jefferson Durant to "strike out . . . modifications of the existing law" "wherever the meaning of the law had been changed." 2 Cong. Rec. 646 (Jan. 14, 1874) (remarks of Rep. Poland); see *id.,* at 826 (Jan. 21, 1874) (remarks of Rep. Lawrence); *id.,* at 129 (Dec. 10, 1873) (remarks of Rep. Butler). On December 10, 1873, Durant's completed work was introduced in the House with the solemn assurance that the bill "embodies the law as it is." *Ibid.*[5]

---

[4] It is worth noting, however, that the statute creating the Revision Commission also directed that the revisers "shall suggest to Congress" all statutory imperfections they had corrected and "the mode" in which they had done so. Act of June 27, 1866, § 3, 14 Stat. 75. The revisers obeyed this directive by placing marginal comments next to each section they deemed to have amended the law. See 2 Cong. Rec. 648 (Jan. 14, 1874) (Rep. Hoar). That no such comment accompanied § 1979 is strong evidence that the revisers intended no substantive change. See 1 Revision of the United States Statutes as Drafted by the Commissioners Appointed for that Purpose 947 (1872).

[5] These assurances were repeated again and again. Representative Butler told his colleagues that the Committee had "not attempted to change the law [in force on December 1, 1873], in a single word or letter, so as to make a different reading or different sense." 2 Cong. Rec. 129 (Dec. 10, 1873). A month later, Representative Poland stated that the bill was

18

The House met in a series of evening sessions to review the bill and to restore original meaning where necessary. During one of these sessions, Representative Lawrence delivered the speech upon which the Court now relies. *Ante,* at 7–8. Lawrence explained that the revisers often had separated existing statutes into substantive, remedial, and criminal sections to accord with the new organization of the statutes by topic. He read both the original and revised versions of the civil rights statutes to illustrate the arrangement, and "possibly [to] show verbal modifications bordering on legislation." 2 Cong. Rec. 827 (Jan. 21, 1874). After reading § 1979 without mentioning the addition of "and laws," Lawrence stated that "[a] comparison of all these will present a fair specimen of the manner in which the work has been done, and from these all can judge of the accuracy of the translation." *Id.,* at 828. Observing that "[t]his mode of classifying . . . to some extent duplicates in the revision portions of statutes" that previously were one, Lawrence praised "the general accuracy" of the revision. *Ibid.* Nothing in this sequence of remarks supports the decision of the Court today. There was no mention of the addition of "and laws" nor any hint that the reach of § 1983 was to be extended. If Lawrence had any such intention, his statement to the House was

---

meant to be "an exact transcript, an exact reflex, of the existing statute law of the United States—that there shall be nothing omitted and nothing changed." *Id.,* at 646 (Jan. 14, 1874). Senator Conkling said that "the aim throughout has been to preserve absolute identity of meaning. . . ." *Id.,* at 4220 (May 25, 1874). See *Chapman* v. *Houston Welfare Rights Org.,* 441 U. S. 600, 625–627 (1979) (POWELL, J., concurring).

Contrary to the Court's suggestion, *ante,* at 8, n. 5, this Court never has held that "the revisers significantly broadened the forerunner of 18 U. S. C. § 242." *United States* v. *Price,* 383 U. S. 787 (1966), involved the interpretation of 18 U. S. C. § 241. The opinion contained dictum to the effect that the similarly worded § 242 was expanded in 1874. 383 U. S., at 803. But the Court did not consider the legislative history of the 1874 revision, and the passing reference to § 242 certainly is not binding precedent.

a singularly disingenuous way of proposing a major piece of legislation.

In context, it is plain that Representative Lawrence did not mention changes "bordering on legislation" as a way of introducing substantive changes in § 1 of the 1871 Act. Rather, he was emphasizing that the revision was not intended to modify existing statutes, and that his reading might reveal errors that should be eliminated. No doubt Congress "was aware of what it was doing." *Ante,* at 8. It was meeting specially in one last attempt to detect and strike out legislative changes that may have remained in the proposed revision despite the best efforts of Durant and the Joint Committee. No Representative challenged those sections of the Revised Statutes that derived from § 1 of the Civil Rights Act of 1871. That silence reflected the understanding of those present that "and laws" did not alter the original meaning of the statute.[6] The Members of Congress who participated in the yearlong effort to expunge all substantive alterations from the Revised Statutes evinced no intent whatever to enact a far-reaching modification of § 1 of the Civil Rights Act of 1871. The relevant evidence, largely ignored by the Court today, shows that Congress painstakingly sought to avoid just such changes.

## III

The legislative history alone refutes the Court's assertion that the 43d Congress intended to alter the meaning of § 1983. But there are other compelling reasons to reject the Court's interpretation of the phrase "and laws." First, by reading those words to encompass every federal enactment, the Court extends § 1983 beyond the reach of its jurisdictional counter-

---

[6] The addition of "and laws" did not change the meaning of § 1 because Congress assumed that that phrase referred only to federal equal rights legislation. In 1874, the only such legislation was contained in the 1866 and 1870 Civil Rights Acts, which conferred rights also secured by the recently adopted Fourteenth Amendment. See n. 1, *supra.*

20

part. Second, that reading creates a broad program for enforcing federal legislation that departs significantly from the purposes of § 1983. Such unexpected and plainly unintended consequences should be avoided whenever a statute reasonably may be given an interpretation that is consistent with the legislative purpose. See *Sorrells* v. *United States*, 287 U. S. 435, 446–448 (1932); *United States* v. *Ryan,* 284 U. S. 167, 175 (1931); *Holy Trinity Church* v. *United States,* 143 U. S. 457, 459 (1892).

## A

The Court acknowledges that its construction of § 1983 creates federal "civil rights" for which 28 U. S. C. § 1343 (3) supplies no federal jurisdiction. *Ante,* at 8, n. 6.[7] The Court finds no "inherent illogic" in this view. *Ibid.* But the gap in the Court's logic is wide indeed in light of the history and purpose of the civil rights legislation we consider today. Sections 1983 and 1343 (3) derive from the same section of the same Act. See *supra,* at 15–16. As originally enacted, the two sections necessarily were coextensive. See *Chapman* v. *Houston Welfare Rights Org.,* 441 U. S., at 616. And this Court has emphasized repeatedly that the right to a federal forum in every case was viewed as a crucial ingredient in the federal remedy afforded by § 1983.

We have stated, for example, that a major purpose of the Civil Rights Acts was to "involve the federal judiciary" in the effort to exert federal control over state officials who refused to enforce the law. *District of Columbia* v. *Carter,* 409 U. S., at 427. Congress did so in part because it thought the state courts at the time would not provide an impartial forum. See *id.,* at 426–429. See generally *Monroe* v. *Pape,* 365 U. S.

---

[7] Section 1343 (3) supplies jurisdiction for claims involving rights secured by the Constitution "or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." Neither § 1983 itself nor the Social Security Act provides for equal rights within the meaning of this section. *Chapman* v. *Houston Welfare Rights Org., supra.*

167, 174–183 (1961); Developments in the Law—Section 1983 and Federalism, 90 Harv. L. Rev. 1133, 1150–1153 (1977). Thus, Congress elected to afford a "uniquely federal remedy," *Mitchum* v. *Foster,* 407 U. S. 225, 239 (1972), that is, a " 'federal right *in federal courts,' " District of Columbia* v. *Carter, supra,* at 428, quoting *Monroe* v. *Pape, supra,* at 180 (emphasis added). Four Terms ago, we considered the origins of § 1343 (3) and § 1983 and concluded that "the two provisions were meant to be, and are, complementary." *Examining Board* v. *Flores de Otero,* 426 U. S., at 583; see *Lynch* v. *Household Finance Corp.,* 405 U. S., at 543, n. 7.

The Court ignores these perceptions and dismisses without explanation the proposition, explicitly accepted in *Flores,* that § 1983 and § 1343 (3) are coextensive. The Court cites no evidence that Congress ever intended to alter so fundamentally its original remedial plan, and I am aware of none.[8] Nearly every commentator who has considered the question has concluded that § 1343 (3) was intended to supply federal jurisdiction in all § 1983 actions. See *Chapman* v. *Houston Welfare Rights Org., supra,* at 637, n. 19 (POWELL, J., concurring) (collecting citations).[9] Since § 1343 (3) covers stat-

---

[8] In the Court's view today, § 1983 actions based on statutes unrelated to equal rights could have been brought in district but not circuit courts after 1874. See n. 2, *supra.* When Congress merged the two jurisdictional provisions in 1911, the narrower language of the circuit court provision was adopted. Act of Mar. 3, 1911, § 24 (14), 36 Stat. 1092. Yet there is no indication in the legislative history of the 1911 Act that Congress intended to change the scope of federal jurisdiction. The Senate Report states that the new section "merges the jurisdiction now vested in the district court . . . and in the circuit courts . . . and vests it in the district courts." S. Rep. No. 388, 61st Cong., 2d Sess., pt. 1, pp. 15, 50–51 (1910).

[9] One author thought it "idiotic" to interpret § 1343 (3) and § 1983 differently. Cover, Establishing Federal Jurisdiction in Actions Brought to Vindicate Statutory (Federal) Rights When No Violations of Constitutional Rights Are Alleged, 2 Clearinghouse Rev., No. 16, pp. 5, 25 (1969). "Only when there is no uncertainty should the courts conclude that Congress has set up a remedial system which overlooks nothing but the minor

utory claims only when they arise under laws providing for the equal rights of citizens, *Chapman* v. *Houston Welfare Rights Org., supra,* at 615–618, the same limitation necessarily is implicit in § 1983. The Court's decision to apply that statute without regard to the scope of its jurisdictional counterpart is at war with the plainly expressed intent of Congress.

## B

The Court's opinion does not consider the nature or scope of the litigation it has authorized. In practical effect, today's decision means that state and local governments, officers, and employees[10] now may face liability whenever a person believes he has been injured by the administration of *any* federal-state cooperative program, whether or not that program is related to equal or civil rights.[11]

### 1

Even a cursory survey of the United States Code reveals that literally hundreds of cooperative regulatory and social welfare enactments may be affected.[12] The States now par-

_____

technicality of giving jurisdiction to some court. The courts should be especially reluctant to reach such a result when there is every evidence that a federal forum was a focal point of the legislation." *Ibid.*

[10] Section 1983 actions may be brought against States, municipalities and other subdivisions, officers, and employees. Although I will refer to all such potential defendants as "state defendants" for purposes of this opinion, there may be a notable difference among them. States are protected against retroactive damages awards by the Eleventh Amendment, and individual defendants generally can claim immunity when they act in good faith. Municipalities, however, will be strictly liable for errors in the administration of complex federal statutes. See *Owen* v. *City of Independence,* 445 U. S. 622 (1980).

[11] The only exception will be in cases where the governing statute provides an exclusive remedy for violations of its terms. See *Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144, 150–151, n. 5 (1970); cf. *Great American Fed. S. & L. Assn.* v. *Novotny,* 442 U. S. 366 (1979).

[12] An incomplete sample of statutes requiring federal-state cooperation is collected in the Appendix to this opinion. Plaintiffs also may contend

ticipate in the enforcement of federal laws governing migrant labor, noxious weeds, historic preservation, wildlife conservation, anadromous fisheries, scenic trails, and strip mining. Various statutes authorize federal-state cooperative agreements in most aspects of federal land management. In addition, federal grants administered by state and local governments now are available in virtually every area of public administration. Unemployment, Medicaid, school lunch subsidies, food stamps, and other welfare benefits may provide particularly inviting subjects of litigation. Federal assistance also includes a variety of subsidies for education, housing, health care, transportation, public works, and law enforcement. Those who might benefit from these grants now will be potential § 1983 plaintiffs.

No one can predict the extent to which litigation arising from today's decision will harass state and local officials; nor can one foresee the number of new filings in our already overburdened courts. But no one can doubt that these consequences will be substantial. And the Court advances no reason to believe that any Congress—from 1874 to the present day—intended this expansion of federally imposed liability on state defendants.

Moreover, state and local governments will bear the entire burden of liability for violations of statutory "civil rights" even when federal officials are involved equally in the admin-

---

that state activities unrelated to cooperative programs have burdened rights secured by federal statutes. E. g., Chase v. McMasters, 573 F. 2d 1011, 1017–1019 (CA8) (authority of Secretary of the Interior to hold Indian lands), cert. denied, 439 U. S. 965 (1978); Wirth v. Surles, 562 F. 2d 319 (CA4 1977) (extradition of prisoners), cert. denied, 435 U. S. 933 (1978); Bomar v. Keyes, 162 F. 2d 136, 139 (CA2) (right to sit on federal juries), cert. denied, 332 U. S. 825 (1947); Gage v. Commonwealth Edison Co., 356 F. Supp. 80, 88 (ND Ill. 1972) (right to an environmental impact statement prior to action in which federal agency participates); McGuire v. Amrein, 101 F. Supp. 414, 417, 419–420 (Md. 1951) (federal ban on the tapping of telephones).

istration of the affected program. Section 1983 grants no right of action against the United States, and few of the foregoing cooperative programs provide expressly for private actions to enforce their terms. Thus, private litigants may sue responsible federal officials only in the relatively rare case in which a cause of action may be implied from the governing substantive statute. Cf. *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11 (1979); *Touche Ross & Co.* v. *Redington,* 442 U. S. 560 (1979). It defies reason to believe that Congress intended—without discussion—to impose such a burden only upon state defendants.

Even when a cause of action against federal officials is available, litigants are likely to focus efforts upon state defendants in order to obtain attorney's fees under the liberal standard of 42 U. S. C. § 1988. There is some evidence that § 1983 claims already are being appended to complaints solely for the purpose of obtaining fees in actions where "civil rights" of any kind are at best an afterthought. In this case, for example, the respondents added a § 1983 count to their complaint some years after the action was initiated, apparently in response to the enactment of the Civil Rights Attorney's Fees Awards Act of 1976. See also *United States* v. *Imperial Irrigation Dist.,* 595 F. 2d 525, 529 (CA9 1979), rev'd on other grounds *sub nom. Bryant* v. *Yellen,* 447 U. S. 352 (1980). The uses of this technique have not been explored fully. But the rules of pendent jurisdiction are quite liberal, and plaintiffs who prevail on pendent claims may win awards under § 1988. *Maher* v. *Gagne, post,* p. 122. Consequently, ingenious pleaders may find ways to recover attorney's fees in almost any suit against a state defendant.[13] Nothing in the legislative history of the Civil Rights Attorney's Fees Awards Act of 1976 suggests that Congress in-

---

[13] See Wolf, Pendent Jurisdiction, Multi-Claim Litigation, and the 1976 Civil Rights Attorney's Fees Awards Act, 2 W. New Eng. L. Rev. 193, 249 (1979).

tended to remove so completely the protection of the "American Rule" in suits against state defendants.[14]

## 2

When Congress revised the statutes in 1874, it hardly could have anticipated the subsequent proliferation of federal statutes. Yet, congressional power to enact laws under the Spending and Commerce Clauses was well known in 1874. Congress need not have foreseen the ultimate scope of those powers to have understood that the expansion of § 1983 to statutory claims would have serious consequences.

Today's decision confers upon the courts unprecedented authority to oversee state actions that have little or nothing to do with the individual rights defined and enforced by the civil rights legislation of the Reconstruction Era.[15] This result cannot be reconciled with the purposes for which § 1983 was enacted. It also imposes unequal burdens on state and federal officials in the joint administration of federal programs and may expose state defendants to liability for attorney's fees in virtually every case. If any Member of the 43d Congress had suggested legislation embodying these results, the proposal certainly would have been hotly debated. It is sim-

---

[14] The few references to statutory claims cited by the Court, *ante*, at 10, and n. 9, fall far short of demonstrating that Congress considered or intended the consequences of the Court's interpretation of § 1983.

[15] Section 1983 was passed for the express purpose of "enforc[ing] the Provisions of the Fourteenth Amendment." Act of Apr. 20, 1871, 17 Stat. 13; see *Lynch* v. *Household Finance Corp.*, 405 U. S. 538, 545 (1972); *Monroe* v. *Pape*, 365 U. S. 167, 171 (1961). The Civil Rights Attorney's Fees Awards Act of 1976 also was passed under the Enforcement Clauses of the Thirteenth and Fourteenth Amendments. 122 Cong. Rec. 33315 (1976) (remarks of Sen. Abourezk); *id.*, at 35123 (remarks of Rep. Drinan). I do not imply that either statute must be limited strictly to claims arising under the post-Civil War Amendments. That Congress elected to proceed under the enforcement powers suggests, however, an intention to protect enduring civil rights rather than the virtually limitless entitlements created by federal statutes.

ply inconceivable that Congress, while professing a firm intention not to make substantive changes in the law, nevertheless intended to enact a major new remedial program by approving—without discussion—the addition of two words to a statute adopted only three years earlier.

## IV

The Court finally insists that its interpretation of § 1983 is foreordained by a line of precedent so strong that further analysis is unnecessary. *Ante,* at 4–5. It is true that suits against state officials alleging violations of the Social Security Act have become commonplace in the last decade. *Ibid.* The instant action follows that pattern. Thus, the Court implies, today's decision is a largely inconsequential reaffirmation of a statutory interpretation that has been settled authoritatively for many years.

This is a tempting way to avoid confronting the serious issues presented by this case. But the attempt does not withstand analysis. Far from being a long-accepted fact, purely statutory § 1983 actions are an invention of the last 20 years. And the Court's seesaw approach to § 1983 over the last century leaves little room for certainty on any question that has not been discussed fully and resolved explicitly by this Court. Compare *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), with *Monroe* v. *Pape,* 365 U. S. 167 (1961). Yet, until last Term, neither this Court nor any Justice ever had undertaken—directly and thoroughly—a consideration of the question presented in this case.

## A

Commentators have chronicled the tortuous path of judicial interpretation of the Civil Rights Acts enacted after the Civil War. See Gressman, The Unhappy History of Civil Rights Legislation, 50 Mich. L. Rev. 1323 (1952); Note, Developments in the Law—Section 1983 and Federalism, 90

Harv. L. Rev. 1133 (1977); Note, The Proper Scope of the Civil Rights Acts, 66 Harv. L. Rev. 1285 (1953). One writer found only 21 cases decided under § 1983 in the first 50 years of its history. Comment, The Civil Rights Act: Emergence of an Adequate Federal Civil Remedy?, 26 Ind. L. J. 361, 363 (1951). Another lamented, as late as 1952, that the statute could not be given its intended broad effect without a "judicial and constitutional upheaval of the first magnitude." Gressman, *supra*, at 1357. That upheaval ultimately did take place, and § 1983 actions now constitute a substantial share of the federal caseload.[16] Nevertheless, cases dealing with purely statutory civil rights claims remain nearly as rare as in the early years.

*Holt* v. *Indiana Manufacturing Co.*, 176 U. S. 68 (1900), appears to be the first reported decision to deal with a statutory claim under § 1983. In that case, the Court dismissed for want of jurisdiction a claim based upon the Constitution and the federal patent laws. The Court stated that §§ 1979, 563 (12), and 629 (16) of the Revised Statutes "refer to civil rights only and are inapplicable here." 176 U. S., at 72. Since *Holt* involved both constitutional and statutory claims, its "civil rights" limitation later was viewed as a general restriction on the application of § 1983.

Although constitutional claims under § 1983 generally were limited to "personal" rights in the wake of *Holt* and Mr. Justice Stone's influential opinion in *Hague* v. *CIO*, 307 U. S.

---

[16] Between 1961 and 1977, the number of cases filed in federal court under civil rights statutes increased from 296 to 13,113. See *Butz* v. *Economou*, 438 U. S. 478, 526 (1978) (REHNQUIST, J., dissenting). New filings have remained relatively constant from 1977 to date. See Director of the Administrative Office of the United States Courts' Ann. Rep. 6, Table 6 (1979). These figures do not include the many prisoner petitions filed annually under 42 U. S. C. § 1983. *Ibid.* If prisoner petitions are included, the number of civil rights cases filed in 1979 rises to 24,951. See *id.*, at A16–A17, Table C–3.

496, 531 (1939),[17] purely statutory claims remained virtually unrecognized. When the United States Court of Appeals for the Second Circuit considered a statutory claim nearly half a century after *Holt,* it found no case whatever "in which the right or privilege at stake was secured by a 'law' of the United States." *Bomar* v. *Keyes,* 162 F. 2d 136, 139, cert. denied, 332 U. S. 825 (1947). The plaintiff in *Bomar* was a public school teacher who alleged that the school board had discharged her because of absences incurred while exercising her statutory right to serve on a federal jury. The Court of Appeals concluded that the complaint stated a claim under §1983. 162 F. 2d, at 139.

The opinion in *Bomar,* which cited no authority and reviewed no legislative history, provoked widespread commentary. See generally Note, The Propriety of Granting a Federal Hearing for Statutorily Based Actions under the Reconstruction-Era Civil Rights Acts: *Blue* v. *Craig,* 43 Geo. Wash. L. Rev. 1343, 1363–1364, and n. 169 (1975). But it appears to have had little practical effect.[18] The issue did not arise with any frequency until the late 1960's, when challenges to state administration of federal social welfare legislation became commonplace. The lower courts responded to these

---

[17] Drawing on *Holt* v. *Indiana Manufacturing Co.,* Mr. Justice Stone argued that § 1983 applies only to rights involving "personal liberty, not dependent for [their] existence upon the infringement of property rights." *Hague* v. *CIO,* 307 U. S., at 531. This view was widely held until this Court rejected it in *Lynch* v. *Household Finance Corp.,* 405 U. S. 538 (1972). See Note, The Propriety of Granting a Federal Hearing for Statutorily Based Actions under the Reconstruction-Era Civil Rights Acts: *Blue* v. *Craig,* 43 Geo. Wash. L. Rev. 1343, 1359–1361 (1975). *Lynch* explained the result in *Holt* as a product of special restrictions on federal jurisdiction over challenges to the collection of state taxes. 405 U. S., at 542–543, n. 6.

[18] The prevailing view limiting § 1983 actions to "personal" rights may have discouraged statutory claims. See n. 17, *supra.* And there was little occasion to consider whether § 1983 was limited to "equal rights" statutes, because the personal/property rights distinction served much the same purpose. Note, 43 Geo. Wash. L. Rev., at 1361, n. 157.

suits with conflicting conclusions. Some found § 1983 applicable to all federal statutory claims.[19] Others refused to apply it to purely statutory rights.[20] Yet others believed that § 1983 covered some but not all rights derived from nonconstitutional sources.[21] Numerous scholarly comments discussed the possible solutions, without reaching a consensus.[22]

## B

The courts and commentators who debated the issue during this period were singularly obtuse if, as the Court now asserts, all doubt as to the meaning of "and laws" had been resolved by a long line of consistent authority going back to 1939. *Ante,* at 4–5. I know of no court or commentator who has

---

[19] *E. g., Blue* v. *Craig,* 505 F. 2d 830, 835–838 (CA4 1974) (Social Security Act); *Gomez* v. *Florida State Employment Service,* 417 F. 2d 569, 579 (CA5 1969) (Wagner-Peyser Act of 1933); *La Raza Unida of Southern Alameda County* v. *Volpe,* 440 F. Supp. 904, 908–910 (ND Cal. 1977) (Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970).

[20] *E. g., Wynn* v. *Indiana State Department of Public Welfare,* 316 F. Supp. 324, 330–333 (ND Ind. 1970) (Social Security Act).

[21] *E. g., Chase* v. *McMasters,* 573 F. 2d, at 1017, and n. 5 (relationship between Federal Government and Indians embodied in the Indian Organization Act of 1934 has "constitutional dimensions"); *McCall* v. *Shapiro,* 416 F. 2d 246, 249–250 (CA2 1969) (Social Security Act not a statute providing for equal or civil rights); *First Nat. Bank of Omaha* v. *Marquette Nat. Bank,* 482 F. Supp. 514, 521–522 (Minn. 1979) (National Bank Act restriction on interest rates not a statute providing for equal or civil rights); cf. *Schatte* v. *International Alliance of Theatrical Stage Employees,* 182 F. 2d 158, 166–167 (CA9 1950) (Social Security Act and National Labor Relations Act enforceable only by remedies prescribed therein).

[22] See Cover, *supra* n. 9, at 24–25; Herzer, Federal Jurisdiction Over Statutorily-Based Welfare Claims, 6 Harv. Civ. Rights-Civ. Lib. L. Rev. 1, 6–8, 19 (1970); Note, 43 Geo. Wash. L. Rev., *supra* n. 17, at 1361–1362; Note, Federal Jurisdiction over Challenges to State Welfare Programs, 72 Colum. L. Rev. 1404, 1426 (1972); Note, The Proper Scope of the Civil Rights Acts, 66 Harv. L. Rev. 1285, 1299–1300 (1953); Note, 16 Geo. Wash. L. Rev. 253, 263 (1948).

thought that all such doubt had been extinguished before today.[23]

The Court quotes the statement in *Edelman v. Jordan,* 415 U. S 651, 675 (1974), that *Rosado v. Wyman,* 397 U. S. 397 (1970), " 'held that suits in federal court under § 1983 are proper to secure compliance with the provisions of the Social Security Act on the part of participating States.' " *Ante,* at 4. If that statement is true, the confusion remaining after *Rosado* is simply inexplicable. In fact, of course, *Rosado* established no such proposition of law. The plaintiffs in that case challenged a state welfare provision on constitutional grounds, premising jurisdiction upon 28 U. S. C. § 1343 (3), and added a pendent statutory claim. This Court held first that the District Court retained its power to adjudicate the statutory claim even after the constitutional claim, on which § 1343 (3) jurisdiction was based, became moot. 397 U. S., at 402–405. The opinion then considered the merits of the plaintiffs' argument that New York law did not comport with the Social Security Act. *Id.,* at 407–420. Although the Court had to assume the existence of a private right of action to enforce that Act, the opinion did not discuss or purport to decide whether § 1983 applies to statutory claims.

*Rosado* is not the only case to have assumed *sub silentio* that welfare claimants have a cause of action to challenge the adequacy of state programs under the Social Security Act. As the Court observes, many of our recent decisions construing the Act made the same unspoken assumption. *Ante,* at 6. It does not necessarily follow that the Court in those cases assumed that the cause of action was provided by § 1983 rather than the Social Security Act itself.[24] But even if it

---

[23] See, *e. g., La Raza Unida of Southern Alameda County v. Volpe, supra,* at 908 (issue "has yet to be definitively resolved").

[24] Contrary to the Court's suggestion, *ante,* at 6, *Edelman v. Jordan,* 415 U. S. 651 (1974), did not exclude the possibility of an implied private right of action under the Social Security Act. *Edelman* held only that a

did, these cases provide no support for the Court's ruling today. "[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio,* this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us." *Hagans* v. *Lavine,* 415 U. S. 528, 535, n. 5 (1974); see *Monell* v. *New York City Dept. of Social Services,* 436 U. S., at 663; *United States* v. *More,* 3 Cranch 159, 172 (1805). This rule applies with even greater force to questions involving the availability of a cause of action, because the question whether a cause of action exists— unlike the existence of federal jurisdiction—may be assumed without being decided. *Burks* v. *Lasker,* 441 U. S. 471, 476, and n. 5 (1979). Thus, the Court's ruling finds no support in past cases in which the issue was not squarely raised. Here, as in *Hagans* v. *Lavine, supra,* at 535, n. 5, we must approach the question "as an open one calling for a canvass of the relevant . . . considerations." [25]

The Court also relies upon "numerous and specific" dicta in prior decisions. *Ante,* at 5. But none of the cited cases contains anything more than a bare assertion of the proposition that is to be proved. Most say much less than that. For example, the Court occasionally has referred to § 1983 as a remedy for violations of "federally protected rights" or of "the Federal Constitution and statutes." *Monell* v. *New York City Dept. of Social Services, supra,* at 700–701; *Owen* v. *City of Independence,* 445 U. S. 622, 649, 650 (1980). These generalized references merely restate the language of the statute. They shed no light on the question whether all or

State does not waive its Eleventh Amendment immunity by participating in the federal assistance program established by that Act. *Id.,* at 673–674. Thus, the lower courts properly have regarded the question as undecided. *Holley* v. *Lavine,* 605 F. 2d 638, 646–647 (CA2 1979); *Podrazik* v. *Blum,* 479 F. Supp. 182, 187–188 (NDNY 1979).

[25] In finding an open question in *Hagans,* the Court expressly declined to follow the implicit holdings of no less than eight decisions of this Court. 415 U. S., at 535, n. 5.

only some statutory rights are protected. To the extent they have any relevance to the issue at hand, they could be countered by the frequent occasions on which the Court has referred to §1983 as a remedy for constitutional violations without mentioning statutes.[26] But the debate would be meaningless, for none of these offhand remarks provides the remotest support for the positions taken in this case.[27]

The only remaining decisions in the Court's "consistent" line of precedents are *Greenwood* v. *Peacock*, 384 U. S. 808, 829–830 (1966), and *Edelman* v. *Jordan*, 415 U. S., at 675. In each case, the Court asserted—without discussion and in the course of disposing of other issues—that §1983's coverage of statutory rights extended beyond federal equal rights laws. Neither contains any discussion of the question; neither cites relevant authority.[28] Nor has this Court always uncritically assumed the proposition for which *Greenwood* and *Edelman*

---

[26] *E. g., Monroe* v. *Pape*, 365 U. S., at 172; see *Procunier* v. *Navarette*, 434 U. S. 555, 561–562 (1978); *Wood* v. *Strickland*, 420 U. S. 308, 322 (1975).

[27] Slightly more specific support may be gleaned from three opinions stating that the Revised Statutes of 1874 "enlarged" or "extended" §1983's predecessor to provide protection for rights secured by federal laws as well as by the Constitution. *Mitchum* v. *Foster*, 407 U. S. 225, 240, n. 30 (1972); *Lynch* v. *Household Finance Corp.*, 405 U. S., at 543, n. 7; *Hague* v. *CIO*, 307 U. S., at 525–526 (opinion of Stone, J.). But each statement was pure dictum incorporated in a discussion of the historical background of §1343 (3). Moreover, each merely noted the evident change in language worked by the revisers. None implies that *all* statutory rights are covered by §1983. Mr. Justice Stone, for example, undoubtedly would be surprised to learn that his opinion—in which he argued that §1983 applied only to "personal" rights—stands for the proposition that statutory rights are covered without limitation.

[28] *Greenwood* v. *Peacock*, 384 U. S., at 828–829, cited only §1983 itself and the leading case of *Monroe* v. *Pape, supra*. *Monroe* had nothing whatever to do with statutory claims. In *Edelman* v. *Jordan, supra,* at 675, the Court relied exclusively on *Rosado* v. *Wyman*, 397 U. S. 397 (1970), which also did not discuss the coverage of §1983. See *supra*, at 30.

now are said to stand. On the same day the Court decided *Edelman,* it refused to express a view on the question whether § 1983 creates a cause of action for purely statutory claims. *Hagans* v. *Lavine, supra,* at 534, n. 5. The point was reserved again in *Southeastern Community College* v. *Davis,* 442 U. S. 397, 404–405, n. 5 (1979).

To rest a landmark decision of this Court on two statements made in dictum without critical examination would be extraordinary in any case. In the context of § 1983, it is unprecedented. Our decisions construing the civil rights legislation of the Reconstruction era have repudiated "blind adherence to the principle of *stare decisis.* . . ." *Greenwood* v. *Peacock, supra,* at 831. As Mr. Justice Frankfurter once observed, the issues raised under § 1983 concern "a basic problem of American federalism" that "has significance approximating constitutional dimension." *Monroe* v. *Pape,* 365 U. S., at 222 (dissenting opinion). Although Mr. Justice Frankfurter's view did not prevail in *Monroe,* we have heeded consistently his admonition that the ordinary concerns of *stare decisis* apply less forcefully in this than in other areas of the law. *E. g., Monell* v. *New York City Dept. of Social Services, supra.* Against this backdrop, there is no justification for the Court's reliance on unexamined dicta as the principal support for a major extension of liability under § 1983.

## V

In my view, the Court's decision today significantly expands the concept of "civil rights" and creates a major new intrusion into state sovereignty under our federal system. There is no probative evidence that Congress intended to authorize the pervasive judicial oversight of state officials that will flow from the Court's construction of § 1983. Although today's decision makes new law with far-reaching consequences, the Court brushes aside the critical issues of congres-

sional intent, national policy, and the force of past decisions as precedent. I would reverse the judgment of the Supreme Judicial Court of Maine.

## APPENDIX TO OPINION OF POWELL, J., DISSENTING

A small sample of statutes that arguably could give rise to § 1983 actions after today may illustrate the nature of the "civil rights" created by the Court's decision. The relevant enactments typically fall into one of three categories: (A) regulatory programs in which States are encouraged to participate, either by establishing their own plans of regulation that meet conditions set out in federal statutes, or by entering into cooperative agreements with federal officials; (B) resource management programs that may be administered by cooperative agreements between federal and state agencies; and (C) grant programs in which federal agencies either subsidize state and local activities or provide matching funds for state or local welfare plans that meet federal standards.

### A. Joint regulatory endeavors

1. Federal Insecticide, Fungicide, and Rodenticide Act, 86 Stat. 973, as amended, 7 U. S. C. § 136 *et seq.* (1976 ed. and Supp. III); see, *e. g.*, §§ 136u, 136v (1976 ed., Supp. III).
2. Federal Noxious Weed Act of 1974, 88 Stat. 2148, 7 U. S. C. §§ 2801–2813; see § 2808.
3. Historic Sites, Buildings, and Antiquities Act, 49 Stat. 666, as amended, 16 U. S. C. §§ 461–467 (1976 ed. and Supp. III); see § 462 (e).
4. Fish and Wildlife Coordination Act, 48 Stat. 401, as amended, 16 U. S. C. §§ 661–666c; see § 661.
5. Anadromous Fish Conservation Act, 79 Stat. 1125, as amended, 16 U. S. C. §§ 757a–757d (1976 ed., Supp. III); see § 757a (a) (1976 ed., Supp. III).
6. Wild Free-Roaming Horses and Burros Act, 85 Stat.

649, as amended, 16 U. S. C. §§ 1331–1340 (1976 ed. and Supp. III) ; see § 1336.

7. Marine Mammal Protection Act of 1972, 86 Stat. 1027, as amended, 16 U. S. C. §§ 1361–1407 (1976 ed. and Supp. III) ; see § 1379.

8. Wagner-Peyser National Employment System Act, 48 Stat. 113, 29 U. S. C. § 49 *et seq.;* see § 49g (employment of farm laborers).

9. Surface Mining Control and Reclamation Act of 1977, 91 Stat. 447, 30 U. S. C. § 1201 *et seq.* (1976 ed., Supp. III) ; see § 1253 (1976 ed., Supp. III).

10. Interstate Commerce Act, 49 Stat. 548, as amended, 49 U. S. C. § 11502 (a)(2) (1976 ed., Supp. III) (enforcement of highway transportation law).

## B. Resource management

1. Laws involving the administration and management of national parks and scenic areas: *e. g.,* Act of May 15, 1965, § 6, 79 Stat. 111, 16 U. S. C. § 281e (Nez Perce National Historical Park); Act of Sept. 21, 1959, § 3, 73 Stat. 591, 16 U. S. C. § 410u (Minute Man National Historical Park); Act of Oct. 27, 1972, § 4, 86 Stat. 1302, 16 U. S. C. § 460bb–3 (b) (Muir Woods National Monument).

2. Laws involving the administration of forest lands: *e. g.,* Act of Mar. 1, 1911, § 2, 36 Stat. 961, 16 U. S. C. § 563; Act of Aug. 29, 1935, 49 Stat. 963, 16 U. S. C. §§ 567a–567b.

3. Laws involving the construction and management of water projects: *e. g.,* Water Supply Act of 1958, § 301, 72 Stat. 319, 43 U. S. C. § 390b; Boulder Canyon Projects Act, §§ 4, 8, 45 Stat. 1058, 1062, as amended, 43 U. S. C. §§ 617c, 617g; Rivers and Harbors Appropriation Act of 1899, § 9, 30 Stat. 1151, 33 U. S. C. § 401.

4. National Trails System Act, 82 Stat. 919, as amended, 16

U. S. C. §§ 1241–1249 (1976 ed. and Supp. III); see § 1246 (h) (1976 ed., Supp. III).

5. Outer Continental Shelf Lands Act Amendment of 1978, § 208, 92 Stat. 652, 43 U. S. C. § 1345 (1976 ed., Supp. III) (oil leasing).

### C. Grant programs

In addition to the familiar welfare, unemployment, and medical assistance programs established by the Social Security Act, these may include:

1. Food Stamp Act of 1964, 78 Stat. 703, as amended, 7 U. S. C. §§ 2011–2026 (1976 ed. and Supp. III); see, *e. g.*, §§ 2020 (e)–2020 (g) (1976 ed., Supp. III).

2. Small Business Investment Act of 1958, § 602 (d), 72 Stat. 698, as amended, 15 U. S. C. § 636 (d) (1976 ed., Supp. III).

3. Education Amendments of 1978, 92 Stat. 2153, as amended, 20 U. S. C. § 2701 *et seq.* (1976 ed., Supp. III); see, *e. g.*, §§ 2734, 2902.

4. Federal-Aid Highway Act legislation, *e. g.*, 23 U. S. C. §§ 128, 131 (1976 ed. and Supp. III).

5. Comprehensive Employment and Training Act Amendments of 1978, 92 Stat. 1909, 29 U. S. C. § 801 *et seq.* (1976 ed., Supp. III); see, *e. g.*, §§ 823, 824.

6. United States Housing Act of 1937, as added, 88 Stat. 653, and amended, 42 U. S. C. § 1437 *et seq.* (1976 ed. and Supp. III); see, *e. g.*, §§ 1437d (c), 1437j.

7. National School Lunch Act, 60 Stat. 230, as amended, 42 U. S. C. § 1751 *et seq.* (1976 ed. and Supp. III); see, *e. g.*, § 1758 (1976 ed. and Supp. III).

8. Public Works and Economic Development Act of 1965, 79 Stat. 552, as amended, 42 U. S. C. § 3121 *et seq.;* see, *e. g.*, §§ 3132, 3151a, 3243.

9. Justice System Improvement Act of 1979, 93 Stat. 1167, 42 U. S. C. § 3701 *et seq.* (1976 ed., Supp. III); see, *e. g.*, §§ 3742, 3744 (c).

10. Juvenile Justice and Delinquency Prevention Act of 1974. 88 Stat. 1109, as amended, 42 U. S. C. § 5601 *et seq.* (1976 ed. and Supp. III); see, *e. g.,* § 5633 (1976 ed. and Supp. III).

11. Energy Conservation and Production Act, 90 Stat. 1125, as amended, 42 U. S. C. § 6801 *et seq.* (1976 ed. and Supp. III); see, *e. g.,* §§ 6805, 6836 (1976 ed. and Supp. III).

12. Developmentally Disabled Assistance and Bill of Rights Act, § 125, 89 Stat. 496, as amended, 42 U. S. C. § 6000 *et seq.* (1976 ed. and Supp. III); see, *e. g.,* §§ 6011, 6063 (1976 ed. and Supp. III).

13. Urban Mass Transportation Act of 1964, 78 Stat. 302, as amended, 49 U. S. C. § 1601 *et seq.* (1976 ed. and Supp. III); see, *e. g.,* §§ 1602, 1604 (g)–(m) (1976 ed. and Supp. III).