**Brenda NELSON, et al., Plaintiffs,**

v.

**GREATER GADSDEN HOUSING AUTHORITY, et al., Defendants.**

Civ. A. No. 82–C–0857–M.

United States District Court, N.D. Alabama, M.D.

March 12, 1985.

Legal Services Corp. of Alabama, James S. Sledge, Gadsden, Ala., Legal Services Corp. of Alabama, Mobile, Ala., for plaintiffs.

William D. Russell, Jr., Gadsden, Ala., for defendants.

## MEMORANDUM OF OPINION

CLEMON, District Judge.

On April 15, 1982, plaintiff Brenda Nelson filed this action against the Greater Gadsden Housing Authority of Gadsden, Alabama ("GGHA") and two of its officials, alleging that they had consistently overcharged public housing tenants for excess utility charges, in violation of the applicable federal statutes and regulations; and that as a result of these overcharges, she was about to be evicted. The defendants were temporarily restrained from evicting plaintiffs; and the temporary restraining order was merged into a preliminary injunction following a hearing.

By subsequent leave of court, additional plaintiffs were added. By agreement of the parties and upon a showing that the named plaintiffs satisfy all of the requirements of FRCP 23(a) and (b)(2), the case was certified as a class action with the following subclasses:

(a) Tenants of GGHA for whom it has supplied electricity (1,000 units) since January 1, 1979;

(b) Tenants of GGHA for whom it has supplied gas (750 units) since January 1, 1979; and

(c) Tenants of GGHA who supply or have supplied their own gas (250 units) since April 15, 1976.

GGHA is a public housing authority organized under the laws of Alabama. § 24–1–1 *et seq.* of the *Code of Alabama of*

*1975.* It receives federal assistance under the United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Individual defendants Ray Ingleheart and Mildred Gilchrist are the executive director and housing director of GGHA, respectively. GGHA is required by law to provide the plaintiff class with reasonable amounts of utility usages, in return for the payment of rent. The United States Department of Housing and Urban Development (HUD), with its oversight responsibilities for public housing authorities receiving federal assistance, has promulgated rules and regulations which define reasonable utility usage.

The plaintiff class contends that the defendants have failed and refused to provide them with reasonable utility usages, thereby denying their substantive and due process rights under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. The class further claims that the defendants have violated binding provisions of 42 U.S.C. § 1437 *et seq.* and the relevant regulations, as well as the annual Contributions Contract between the defendants and HUD.

The defendants virtually concede that they are not in compliance with the applicable regulations governing utility allowances. Therefore, following a hearing on the motion of the plaintiff class for a preliminary injunction, the Court enjoined the defendants to set utility allowances at substantially higher rates, and to reimburse tenants who supply their own gas by the amount that the allowance exceeded the rent. The allowances have since been adjusted twice.

The injunctive relief having been disposed of, the remaining issue is the plaintiff class' entitlement *vel non* to compensatory damages. Pending before the Court are the parties' cross motions for summary judgment.

Based on the pleadings, affidavits and attachments thereto, exhibits, depositions, admissions, interrogatories and answers thereto, the Court makes the following findings of fact and conclusions of law. Based thereon, the plaintiff class is entitled to judgment as a matter of law.

## I. History And Overview Of Utility Allowances In Conventional Public Housing

The conventional public housing program originated with the United States Housing Act of 1937 (USHA), Pub.L. No. 412, 50 Stat. 888 (Sept. 1, 1937) (now codified, as amended, at 42 U.S.C. §§ 1437 *et seq.*). The avowed goal of this Act is "to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe and sanitary dwellings for families of lower income...." 42 U.S.C.A. § 1437 (West Supp.1984).[1] According to USHA, lower income housing means decent, safe and sanitary dwellings; public housing is lower income housing and all necessary appurtenances thereto. 42 U.S.C.A. § 1437a(b)(1) (West Supp.1984).

In compliance with these statutory goals and in conformance with statutory definitions requiring public housing to encompass all necessary appurtenances, public housing authorities (PHAs) have historically provided tenants with necessary utilities. *See* 49 *Fed.Reg.* 21476, 21483 (May 21, 1984) (HUD commentary upon final rule); 47 *Fed.Reg.* 35249–50 (August 13, 1982) (HUD commentary accompanying proposed rule making). In 1963, HUD issued a handbook with instructions to PHAs about the computation of utility allowances. HUD, *Local Housing Authority Management Handbook,* Section 9, "Controlling Utility Consumptions and Costs" (April

---

**1.** Congress has also stated as its national housing policy that "the general welfare and security of the Nation and the health and living standards of its people require housing production and related community development sufficient to remedy the serious housing shortage, the elimination of substandard and other inadequate housing through the clearance of slums and blighted areas, and the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family, thus contributing to the development and redevelopment of communities and to the advancement of the growth, wealth and security of the Nation. 42 U.S.C. § 1441.

1963) (hereinafter entitled *LHA Handbook*).

In 1969, USHA was amended so as to limit the rent that PHAs could charge tenants to 25% of adjusted family income. *See* Pub.L. No. 91–152, § 213(a), 83 Stat. 389 (1969) (the Brooke Amendment) (codified, prior to amendment, at 42 U.S.C. § 1437a).[2]

In 1970 HUD, promulgating rules to effectuate the Brooke Amendment, defined rent to include the cost of reasonable amounts of utilities, so that when tenants leased units from PHAs, they were to be provided not merely with shelter, but also with the cost of reasonable utility usage. *See* HUD Circular, *Implementation of Sections 212 and 213 of the Housing and Urban Development Act of 1969* (RHM 7465.1 and 7475.1) (March 16, 1970); 49 *Fed.Reg.* 21476, 21483 (May 21, 1984) (HUD commentary to final rule). In 1975, these definitions were incorporated in substantially unchanged form in HUD regulations published in the *Federal Register* and have appeared since then in the *Code of Federal Regulations*. *See* 40 *Fed.Reg.* 44323, 44324–25 (September 26, 1975) (now codified at 24 C.F.R. §§ 860.403(a), (i) and (1)).[3]

**2.** The 25% limit was amended in 1981 so as to raise the rent limit to the highest of 30% of adjusted family income; 10% of total family income; and that portion of a family's welfare assistance payment designated to meet the family's housing costs. *See* 42 U.S.C. § 1437a(a) (West Supp.1984). For families admitted after August 1, 1982, the new rent limits are effective immediately. For families who were already tenants on August 1, 1982, the increase is being effected at the rate of 1% per year. For these families, the rate now stands at 28%. *See* 24 C.F.R. § 860.404 (1983); 49 *Fed.Reg.* 24176, 21488 (May 21, 1984) (to be codified at 24 C.F.R. § 913.107).

**3.** Several definitions of rent occur in 24 C.F.R. § 860.403. The different definitions are designed to address the two methods by which public housing authorities (PHAs) may provide tenants with reasonable amounts of utilities.

First, "rent", that is the rent that according to the Brooke Amendment cannot exceed 25%–30% of family income, is defined as "gross rent." *Id.* at § 860.403(1). Second, "gross rent" is defined as "contract rent plus the PHAs estimate of the cost to the tenant of reasonable quantities of utilities determined in accordance with the PHAs' schedule of allowances for such utilities, where such utilities are purchased by the tenant and not included in the contract rent." *Id.* at § 860.403(i). "Last, 'contract rent' is defined as 'the rent charged a tenant for the use of the dwelling accommodation and equipment (such as ranges and refrigerators but not including furniture), services and reasonable amounts of utilities determined in accordance with the PHAs' schedule of allowances for utilities supplied by the project.'" *Id.* at Section 860.403(a).

Thus, contract rent is the amount the tenant actually pays to the PHA pursuant to the lease. According to the Brooke Amendment, this amount cannot exceed 25%–30% of the tenant's income. The definition of contract rent guarantees that in exchange for this payment, the PHA is to provide tenants with reasonable amounts of utilities. Only if the tenants use exceeds this reasonable amount, i.e., exceeds the utility allowance, may the PHA charge the tenant for his/her utility use. On the other hand, if the PHA charges the tenant for reasonable amounts of usage, i.e., if the utility allowance is too low, the PHA is charging the tenant more than the Brooke Amendment permits.

Some PHAs, however, require tenants to contract directly with the utility company. The definition of gross rent guarantees that the sum of the actual rent paid to the PHA (the contract rent) and the reasonable cost of utility usage charged the tenant by the utility company cannot exceed the Brooke Amendment levels. As a practical matter, PHAs determine 25%–30% of family income and then subtract from this figure the amount that the PHA has determined to be the reasonable cost of utility usage (the utility allowance).

The difference is the amount the PHAs charge as rent. If the allowance is not sufficient to cover the amounts the tenant pays to the utility company for reasonable usage, then the tenant will pay contract rent to the PHA in excess of that permitted by the Brooke Amendment. If the tenant's income is so low that 25%–30% of the tenants family income is smaller than the allowance, the PHA provides the tenant with the full allowance by reducing the rent to zero and paying the tenant the amount by which the allowance exceeded the rent. *See* HUD, *Public Housing Occupancy Handbook*, 7465.1 REV, Paragraph 3–4 (October 1978); Hud, *Rent Adjustment Required by Section 213 of the Housing and Urban Development Act of 1969*, Paragraph 12 (RHM 7465.3 and 7465.1).

HUD has recently promulgated new regulations replacing those that now appear at 24 C.F.R. §§ 860.401 to .406. *See* 49 *Fed.Reg.* 21476 *et seq.* (May 21, 1984) (effective July 1, 1984). The new regulations also require PHAs to provide reasonable amounts of utilities to tenants. *Id.* at 21485–86 (to be codified at 24 C.F.R. § 913.102) (definitions of "tenant rent," "utility allowance" and "utility reimbursement"). The new regulations also explicitly re-

In January 1979, HUD proposed to place its regulations regarding the calculations of reasonable utility allowances in the *Code of Federal Regulations. See* 44 *Fed.Reg.* 1600 (January 5, 1979). Those proposed regulations were adopted, with revisions, on September 9, 1980. *See* 45 *Fed.Reg.* 59502–08 (September 9, 1980) (now codified at 24 C.F.R. § 865.470 (*et seq.*) (the interim rule).[4] These regulations were based on those that had earlier appeared in the *LHA Handbook. See id.* at 59502 (therein called *HUD Guide*). The effective date of the regulations was October 1, 1980. PHAs were required to establish allowances based upon the regulations no later than 120 days after the effective date of the regulations. *See* 24 C.F.R. § 865.482. The allowances were, then, to have been in place by January 29, 1981.

## II. The Method By Which Utility Allowances Are Computed

### A. Pre-Interim Rule

Prior to January 29, 1981, the implementation date of the interim rule, HUD's instructions to PHAs for computing utility allowances were contained in the *LHA Handbook.* Where tenants purchased gas or electricity directly from a utility company, the *LHA Handbook* directs that the reasonable costs of utilities are deducted from the gross rents to obtain the contract rents actually paid by the tenants to the PHA. In computing the allowances, a survey of actual costs to tenants should be made. PHAs are instructed to check the dollar allowances periodically to insure their reasonableness. If they are not reasonable, they should be revised. *LHA Handbook,* Part II, Section 9, Chapters 3 and 5.

Where the PHA provides tenants with utilities and surcharges the tenants if they exceed the utility allowance, the *LHA Handbook* states that allowances should normally be set at 20% above average use so as to prevent surcharging too many tenants. If more than 25% of the tenants are surcharged during any billing period, the allowance should normally be revised so that about 10% of the tenants will be surcharged. *LHA Handbook,* Part II, § 9, Chapter 2, paragraph 10; Chapter 4, paragraph 10.

### B. The Interim Rule: 24 C.F.R. §§ 865.470 *et seq.*

The interim rule, with some exceptions, is essentially a more detailed statement of the methods and principles appearing in the *LHA Handbook.* For tenants who purchase their own utilities, PHAs are instructed to fix allowances at the average amount of consumption per month multiplied by the current utility rate.

Instances of unusually high tenant utility usage are excluded from the calculations. *See* 24 C.F.R. § 865.478. PHAs are instructed to revise the allowances at least once every three years. In addition, if a rate change which, by itself or together with prior rate changes not adjusted for, results in a change of 10% or more, the PHA is instructed to revise the allowance to account for the change. *Id.* at § 865.-480(c).

Where the PHA provides tenants with utilities and surcharges the tenants if they exceed the utility allowance, PHAs are instructed to establish the allowances at a level sufficient to meet the requirements of 90% of the tenants. The allowances should be high enough so that only 10% of the tenants are surcharged.

In determining the allowances, PHAs may exclude instances of unusually high utility usage due to unusual individual circumstances, wasteful practices, or use of the utility for major tenant-supplied appli-

---

quire a PHA to reimburse a tenant for whom the PHA does not supply a utility in the amount by which the utility allowance exceeds the rent. *Id.* at 21485–86 and 21488 (to be codified at 24 C.F.R. §§ 913.102 and 913.108). *See infra* text accompanying note 4.

**4.** Effective March 28, 1984, HUD reorganized its regulatory scheme. *See* 49 *Fed.Reg.* 6712 *et seq.* (February 23, 1984). In this reorganization, 24 C.F.R. Part 865 was redesignated 24 C.F.R. Part 965. *Id.* at 6714. In this opinion reference will be made to the "865" designation rather than the new "965" designation.

ances. *See* 24 C.F.R. § 865.477. PHAs are instructed to determine at the end of each billing period the number and percentage of tenants who have been surcharged. If more than 25% have been surcharged and there is no reason of a non-recurring nature (such as weather extremes) to account for this, the PHA shall if appropriate revise the allowance in accordance with § 865.477. *See id.* at § 865.480(b).

### III. The Allowance For Tenant Purchased Gas at GGHA

Defendant GGHA operates 1,000 units of public housing in six different projects. In each of the 1,000 units, GGHA provides tenants with electricity, i.e., GGHA contracts directly with the power company and demands tenant reimbursement only to the extent that the tenants use electricity above their allotted allowances.

In 750 units, GGHA provides tenants with gas, i.e., GGHA contracts directly with the gas company and demands tenant reimbursement only to the extent that the tenants use gas above their allotted allowance. In 250 units, however—those located at Campbell Court and Starnes Park—the tenants purchase their own gas directly from the gas company.

In the 250 units in which tenants buy their own gas, the heating system, hot water heater and stove and oven all run on gas.

The defendants provides these tenants with a gas allowance by giving them a credit toward their rent. Prior to the filing of this lawsuit, the credit allowance was $5.00 per month for a one bedroom apartment; $7.00 per month for a two bedroom apartment; and $8.00 per month for a three bedroom apartment. Prior to March 1, 1977, the credit allowance was $4.00 per month for all bedroom sizes.

The allowances were not adjusted between March 1, 1977 and March 4, 1983, the date of the preliminary injunction, despite the intervention of the "interim rule" and its implementation date of January 29, 1981.

When the amount of the allowance exceeded the rent, defendants would reduce the rent to zero, but would not pay the tenant the amount by which the allowance exceeded the rent. For example, if the allowance were $8.00, but a tenant's rent were only $5.00, defendants would reduce the rent to zero, but would not pay the tenant the remaining $3.00. Thus, the tenants would not receive the full allowance.

The gas allowance at Campbell Court and Starnes Park has been inadequate throughout the period drawn into issue by this lawsuit. The parties have together computed the arithmetic means of dollar cost to tenants for gas consumption at Starnes Park and Campbell Court from April 1976 through May 1983. The parties agree that the underlying data (records of the gas company) is accurate and that the computations are correct. Moreover, the calculations were performed only after excluding instances of unusually high tenant usage, as agreed upon by the parties.

The calculations, therefore, represent the average reasonable dollar cost to the tenants for gas consumption at Starnes Park and Campbell Court. The result demonstrates that the gas allowance has been fundamentally inadequate. When averaged over annual periods, the computations, as compared to the annual GGHA allowances, reveal the following:

### TABLE I

#### ONE BEDROOM APARTMENT

| | Actual Average Monthly Expenditure | GGHA Monthly Allowance |
|---|---|---|
| 1976 (based upon 9 months) | $ 7.90 | $ 4.00 |
| 1977 | 10.47 | 4.00 (prior to March 1) |
| | | 5.00 (thereafter) |
| 1978 | 12.01 | 5.00 |
| 1979 | 15.27 | 5.00 |
| 1980 | 18.23 | 5.00 |
| 1981 | 20.43 | 5.00 |
| 1982 | 23.31 | 5.00 |
| 1983 (based upon 5 months) | 34.97 | 5.00 (prior to March 1) |
| | | 13.00 (thereafter) [1] |

---

[1] The increase in allowances on March 1, 1983 for all three apartment sizes occurred as a result of this Court's preliminary injunction of March 4, 1983.

## TABLE II

### TWO BEDROOM APARTMENTS

| | Actual Average Monthly Expenditure | GGHA Monthly Allowance |
|---|---|---|
| 1976 (based upon 9 months) | $ 8.85 | $ 4.00 |
| 1977 | 11.95 | 4.00 (prior to March 1) |
| | | 7.00 (thereafter) |
| 1978 | 13.88 | 7.00 |
| 1979 | 17.00 | 7.00 |
| 1980 | 20.23 | 7.00 |
| 1981 | 22.12 | 7.00 |
| 1982 | 25.22 | 7.00 |
| 1983 (based upon 5 months) | 37.63 | 7.00 (prior to March 1) |
| | | 17.00 (thereafter) [1] |

[1] The increase in allowances on March 1, 1983 for all three apartment sizes occurred as a result of this Court's preliminary injunction of March 4, 1983.

## TABLE III

### THREE BEDROOM APARTMENTS

| | Actual Average Monthly Expenditure | GGHA Monthly Allowance |
|---|---|---|
| 1976 (based upon 9 months) | $10.51 | $ 4.00 |
| 1977 | 14.14 | 4.00 (prior to March 1) |
| | | 8.00 (thereafter) |
| 1978 | 17.06 | 8.00 |
| 1979 | 21.21 | 8.00 |
| 1980 | 24.07 | 8.00 |
| 1981 | 27.93 | 8.00 |
| 1982 | 32.45 | 8.00 |
| 1983 (based upon 5 months) | 49.31 | 8.00 (prior to March 1) |
| | | 21.00 (thereafter) [1] |

[1] The increase in allowances on March 1, 1983 for all three apartment sizes occurred as a result of this Court's preliminary injunction of March 4, 1983.

The gas allowances at Starnes Park and Campbell Court have lagged far behind the rates charged the tenants by the gas company. By letter of November 3, 1977, HUD had reminded GGHA that its allowances at Starnes Park and Campbell Court should be reviewed annually to insure that the rates did not change to such a degree as to render the allowance inadequate.

GGHA, however, did not revise its gas allowance so as to keep pace with the increasing cost of gas that was an ineluctable fact of life for the tenants at Starnes Park and Campbell Court. Inevitably, then, as the years passed, GGHA's gas allowance was an ever-shrinking percentage of the tenants' actual expenditures for gas. Even in 1976, the allowance was only approximately 50% of the actual, reasonable expenditures of tenants in one-bedroom apartments and was less than that for tenants living in two and three bedroom apartments.

By 1982 and 1983 the allowance was such a small percentage of the tenants' actual, reasonable expenditures that it may, without exaggeration, be characterized as no more than a token.

### IV. The Allowance For PHA Supplied Gas and Electricity at GGHA

In all 1,000 units of public housing operated by GGHA, it provides tenants with electricity. In 750 units, all units except those at Starnes Park and Campbell Court, GGHA provides tenants with gas.

Prior to January 1, 1979, those tenants for whom GGHA supplied electricity were assessed a flat charge for certain major tenant-supplied appliances. Other than this charge, no excess utility charges were assessed tenants for GGHA-supplied electricity. Prior to January 1, 1979, those units for which GGHA supplied gas were not assessed an excess utility charge of any sort. Plaintiffs in this action do not challenge the GGHA's utility allowance structure for GGHA-furnished utilities prior to January 1, 1979.

In the spring of 1978, GGHA installed an individual check meter system for the 1,000 units for which GGHA supplied electricity and the 750 units for which GGHA supplied gas. Beginning January 1, 1979, GGHA began charging tenants in these units for utility consumption in excess of the allow-

ance structure that was also put into place on January 1, 1979.

Subsequent to the establishment of allowances and the inauguration of the surcharge system on January 1, 1979, the allowances were not altered or updated until this Court ordered defendants to do so on March 4, 1983 and March 17, 1983. Furthermore, defendants never monitored the allowance system to determine the number of percentage of tenants who were being surcharged each month.

From January 1979 through February 1983 a large percentage of tenants were surcharged for both gas and electricity usage. These surcharges may be summarized as follows:

### TABLE IV

PERCENTAGE OF TENANTS SURCHARGED FOR
EXCESS GAS USAGE (January 1979 through February 1983)

| | TOTAL MONTHS (January 1979 through February 1983) | NUMBER OF MONTHS THAT MORE THAN 10% OF TENANTS WERE SURCHARGED | NUMBER OF MONTHS THAT 25% OR MORE OF TENANTS WERE SURCHARGED | NUMBER OF MONTHS THAT 50% OR MORE OF TENANTS WERE SURCHARGED |
|---|---|---|---|---|
| One-Bedroom Apts | 50 | 45 | 34 | 6 |
| Two-Bedroom Apts | 50 | 43 | 25 | 1 |
| Three-Bedroom Apts | 50 | 44 | 37 | 12 |
| Four-Bedroom Apts | 50 | 47 | 46 | 39 |
| Five-Bedroom Apts | 50 | 46 | 40 | 21 |

### TABLE V

PERCENTAGE OF TENANTS SURCHARGED FOR
EXCESS ELECTRICITY USAGE (January 1979 through February 1983)

| | TOTAL MONTHS (January 1979 through February 1983) | NUMBER OF MONTHS THAT MORE THAN 10% OF TENANTS WERE SURCHARGED | NUMBER OF MONTHS THAT 25% OR MORE OF TENANTS WERE SURCHARGED | NUMBER OF MONTHS THAT 50% OR MORE OF TENANTS WERE SURCHARGED |
|---|---|---|---|---|
| One-Bedroom Apts | 50 | 43 | 12 | 0 |
| Two-Bedroom Apts | 50 | 46 | 16 | 0 |
| Three-Bedroom Apts | 50 | 49 | 39 | 2 |
| Four-Bedroom Apts | 50 | 50 | 42 | 14 |
| Five-Bedroom Apts | 50 | 39 | 28 | 5 |

Plaintiffs' and defendants' attorneys have gathered the data necessary to compute what the allowances should have been from January 1979 through February 1983.[5] The parties have agreed that the underlying data is accurate and that the computations are correct. The parties also agreed upon what units should be excluded from the computations as instances of unusually high usage. The parties have disa-

5. According to HUD's *Local Housing Authority Management Handbook,* the allowance for utilities furnished by the public housing authority (PHA) should be computed at 125% of average usage. If more than 25% of the tenants are surcharged in any month, however, the allowance should be recomputed so that approximately 10% are surcharged. By agreement, the parties omitted the first step—computing the allowances at 125% of average usage—and computed the allowance such that 10% of the tenants would be surcharged after excluding instances of unusually high usage. The first step was omitted because it appeared to the parties that should the allowance be computed at 125% of average usage, more than 25% of the tenants would have been surcharged for most months. Defense counsel's cooperation in computing these allowances did not constitute an admission of liability or waiver of defenses. His participation does, however, constitute his admission that the allowances were computed accurately in accordance with the standards contained in the HUD handbook for periods prior to January 29, 1981 and with the interim rule for computing utility allowances, 24 C.F.R. § 865.470 *et seq.,* whose effective date was January 29, 1981, for periods on and after January 29, 1981.

greed upon only one point in computing the allowances as should be. Even using the figures representing defendants' position, which are generally lower than the figures representing plaintiffs' position, it is clear that for most months since January 1979 the GGHA allowance for both gas and electricity was lower than it should have been.

### TABLE VI

NUMBER OF MONTHS IN WHICH GGHA'S ELECTRICITY ALLOWANCE WAS TOO LOW ACCORDING TO DEFENDANTS' POSITION

| | TOTAL MONTHS (January 1979 through February 1983) | NUMBER OF MONTHS ALLOWANCE WAS TOO LOW |
|---|---|---|
| One-Bedroom Apts | 50 | 30 |
| Two-Bedroom Apts | 50 | 45 |
| Three-Bedroom Apts | 50 | 47 |
| Four-Bedroom Apts | 50 | 49 |
| Five-Bedroom Apts | 50 | 20 |

### TABLE VII

NUMBER OF MONTHS IN WHICH GGHA'S GAS ALLOWANCE WAS TOO LOW ACCORDING TO DEFENDANTS' POSITION

| | TOTAL MONTHS (January 1979 through February 1983) | NUMBER OF MONTHS ALLOWANCE WAS TOO LOW |
|---|---|---|
| One-Bedroom Apts | 50 | 41 |
| Two-Bedroom Apts | 50 | 40 |
| Three-Bedroom Apts | 50 | 43 |
| Four-Bedroom Apts | 50 | 47 |
| Five-Bedroom Apts | 50 | 44 |

The large number of tenants surcharged each month by GGHA demonstrates that GGHA's allowances were insufficient to meet the needs of many of its tenants. This could not have been due to unusual or unreasonable usage by the tenants. The calculations performed by the parties, in which instances of unusually high or unrea-

sonable usage were excluded, nevertheless show that the allowances for almost all months were set too low. It follows, then, that so many tenants were surcharged because the allowances were set too low to meet their reasonable needs.[6]

### V. Leases And Annual Contributions Contract

In the form lease used by defendants, GGHA agrees to comply with requirements of applicable regulations of HUD. This promise by GGHA has appeared in the form lease used by GGHA during all periods at issue in this lawsuit.

The conventional public housing program is administered in part through a contractual agreement between HUD and public housing authorities. This agreement is called the Annual Contributions Contract (ACC). In the ACC the housing authority agrees to adhere to the United States Housing Act of 1937 and the regulations promulgated thereunder. *See King v. Housing Auth. of Huntsville*, 670 F.2d 952, 953 n. 1 (11th Cir.1982). The housing authority also agrees to operate its projects so as to maintain the economic and social well-being of its tenants and to maintain the low-rent character of its projects. The ACC further provides that the housing authority will comply with the rules and regulations adopted by HUD for computing utility allowances.

### VI. The Responsibility of GGHA

Defendants admit that until 1981 they never monitored the utility allowances for PHA—or tenant-supplied utilities so as to keep abreast of the adequacy of the allow-

---

**6.** Defendants point to HUD statements indicating HUD's opinion that the *LHA Handbook* is non-mandatory. *See e.g.* 45 *Fed.Reg.* 59502 (September 9, 1980). The Court need not reach this issue since the number of tenants surcharged each month and the parties' determination, after excluding instances of unreasonable usage, that the allowances were set too low for most months demonstrate that the allowances contravened the Brooke Amendment and HUD implementing regulations by failing to meet the reasonable needs of its tenants.

Moreover, even if the *LHA Handbook* were not intended to be mandatory when published in 1963, the intervening passage of the Brooke

Amendment and HUD implementing regulations altered the status quo by explicitly requiring PHAs to provide tenants with utilities sufficient to meet their needs in exchange for a statutorily fixed rental payment. The *LHA Handbook* obviously contains HUD's opinion of the allowance required to meet the reasonable needs of public housing tenants. This is confirmed by HUD's adoption of the handbook standards, substantially unchanged, in the interim rule. The Court therefore adopts as its own HUD's interpretation of what constitutes a reasonable utility allowance under the Brooke Amendment and HUD's implementing regulations.

ances. They do not really dispute the accuracy of the computations that demonstrate the inadequacy of the utility allowances throughout the period encompassed by this lawsuit.

The only substantive defense proffered by the defendants is that their allowances were initially approved by HUD and that HUD never authorized them to change the allowances. They say that they are therefore not responsible for the inadequate allowances.

On one occasion the defendants submitted a proposal to HUD for an increase in the allowances. HUD did not respond to this proposal. The Court finds that the proposal did not comply with then-current HUD regulations in that it was not first submitted to the tenants. See 24 C.F.R. § 865.473(a) (1982). Moreover, the proposed allowances were not computed in accordance with the requirements of the interim rule. Further, the undisputed evidence shows that even if the proposed allowances had been accepted by HUD, they would have been inadequate under the existing regulations. The defendants never pursued their proposal with HUD; a year after the lawsuit was filed, the Housing Director did not know whether HUD had actually received the proposal.

The facts relied upon by defendants are essentially an assertion of good faith on their part. However, the plaintiff class does not seek punitive damages in this action.[7] Plaintiffs seek only reimbursement for past overpayments to GGHA. Moreover, although Iglehart and Gilchrist are defendants, they have been sued only in their official capacities.

## CONCLUSIONS OF LAW

1. The GGHA is bound by the duly promulgated HUD regulations which implement 42 U.S.C. § 1437. *King v. Housing*

*Authority of Huntsville,* 670 F.2d 952, 954 (11th Cir.1982).

2. Further, it is the clear duty of GGHA to establish and administer utility allowances. 24 C.F.R. § 865.470 (1983). The inadequate utility allowances allotted by GGHA to the plaintiff class during the relevant period have effectively violated 42 U.S.C. § 1437a's provision that the rent of a public housing tenant shall not exceed 25% of income in the case of a very low income family or 30% of income in the case of other families.

3. In enacting 42 U.S.C. § 1437, Congress did not foreclose private enforcement of the statute. Further, 42 U.S.C. § 1437a(1) is of the species that creates enforceable rights under § 1983. *McGhee v. Housing Authority of Lanett,* 543 F.Supp. 607, 608 (M.D. of Ala.1982). Therefore, the statutory claims of the plaintiff class under 42 U.S.C. § 1437a are cognizable under 42 U.S.C. § 1983. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

4. On the pendant state claim of the plaintiff class, the defendants have breached the contractual duty owed to the plaintiff class, under the terms of the form lease to comply with the applicable regulations of HUD. The plaintiff class has suffered damages in the form of increased rents due to this breach of contract; and it is entitled to recover those damages from the defendants.

5. The Court finds it unnecessary to reach plaintiffs' contentions that a private right of action is available under the Brooke Amendment to the Federal Housing Act of 1937, that they may sue as third-party beneficiaries of the annual contributions contracts between GGHA and HUD, and that their property has been taken without just compensation and due process in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

---

7. Defendants have not cited to this Court any authority for the proposition that bad faith is an element of any of plaintiffs' causes of action, or that good faith is a defense available to defendants. In fact, a qualified, good faith, immunity defense is not available to a local government entity in a § 1983 action. *See Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

## DECREE

Based on the accompanying Memorandum Of Opinion, it is hereby ORDERED, ADJUDGED, DECLARED and DECREED as follows:

1. The defendants GREATER GADSDEN HOUSING AUTHORITY, RAY INGLEHART, MILDRED GILCHRIST, their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order are hereby PERMANENTLY ENJOINED FROM:

(a) Failing or refusing to immediately adopt and implement utility allowances for tenants in units of public housing at rates not less than those specified in "Exhibit A", appended hereto.

(b) Failing or refusing to alter or amend the utility allowances in the future in accordance with 24 C.F.R. § 865.477 (1983) or such subsequent regulation outlining standards for utility allowances as may be promulgated by the Secretary of Housing and Urban Development. These allowances shall be computed at least annually.

(c) Failing or refusing to otherwise comply with the regulations relating to the establishment of Tenant Allowances for Utilities as promulgated by the Secretary of Housing and Urban Development, presently codified at 24 C.F.R. § 865.470–865.482 (1983).

2. The plaintiff class shall have and recover of defendants GREATER GADSDEN HOUSING AUTHORITY, RAY INGLEHART and MILDRED GILCHRIST, in their official capacities, as such damages as the Court may deem them to be entitled by separate order. A hearing on damages shall be held at the Federal Courthouse in Gadsden, Alabama, commencing at 9:00 A.M. on Friday, April 5, 1985.

3. The plaintiff class shall be entitled to a reasonable attorney's fee, the amount of which shall be set by the Court in a separate order. A hearing on this issue shall commence upon the completion of the hearing on damages. By March 29, 1985, counsel for the class shall serve on defendants' counsel and file with the Court a statement of their claim for fees and expenses, together with the date(s) on which service was rendered or costs incurred, a description of the services rendered or costs incurred, and the time required for the services rendered.

4. Plaintiff shall recover her costs herein.

## EXHIBIT A

### UTILITY ALLOWANCES

#### I. ALLOWANCES FOR TENANT–PURCHASED GAS

| ONE BEDROOM | TWO BEDROOMS | THREE BEDROOMS |
|---|---|---|
| $25.50/month | $29.00/month | $36.50/month |

#### II. ALLOWANCES FOR GGHA–FURNISHED ELECTRICITY

Quarterly Allowance (KWH)

|  | 1 BR | 2 BR | 3 BR | 4 BR | 5 BR |
|---|---|---|---|---|---|
| First Quarter (January-March) | 799 | 1080 | 1448 | 1854 | 1820 |
| Second Quarter (April-June) | 806 | 1097 | 1461 | 1865 | 1697 |
| Third Quarter (July-September) | 1207 | 1783 | 2066 | 2634 | 2550 |
| Fourth Quarter (October-December) | 837 | 1100 | 1428 | 1812 | 1825 |

### III. ALLOWANCES FOR GGHA–FURNISHED GAS

Quarterly Allowance (CCF)

| | 1 BR | 2 BR | 3 BR | 4 BR | 5 BR |
|---|---|---|---|---|---|
| First Quarter (January-March) | 279 | 322 | 414 | 605 | 598 |
| Second Quarter (April-June) | 126 | 148 | 191 | 285 | 281 |
| Third Quarter (July-September) | 66 | 90 | 117 | 173 | 163 |
| Fourth Quarter (October-December) | 153 | 179 | 232 | 364 | 332 |