Lucius H. SLAY and Lena M. Slay, Individually and as Administrator and as Administratrix of the Estate of Rodney Harding Slay, Appellants–Plaintiffs,

v.

The MARION COUNTY SHERIFF'S DEPARTMENT, and John H. Jones, Deputy Sheriff, Appellees–Defendants.

No. 41A04–9112–CV–399.

Court of Appeals of Indiana, Fourth District.

Nov. 23, 1992.

Michael K. Sutherlin, Offer Korin, Frank C. Capozza, Indianapolis, Jeffrey M. Linder, Shelbyville, for appellants-plaintiffs.

Andrew P. Wirick, City–County Legal Div., Indianapolis, for appellees-defendants.

CHEZEM, Judge.

### Case Summary

Plaintiffs–Appellants, Lucius and Lena Slay ("the Slays"), Individually and as Administrators of the Estate of Rodney Harding Slay ("Rodney"), appeal from the summary judgment granted in favor of the Defendants–Appellees, The Marion County Sheriff's Department ("Sheriff's Department"), and John H. Jones, Deputy Sheriff

("Jones") (sometimes, collectively "Appellees"). We affirm in part (as to summary judgment for the Sheriff's Department), and reverse in part.

### Issues

The parties have presented numerous issues for our review, which we restate as follows:

I. Whether this appeal should be dismissed on jurisdictional grounds.

II. Whether there are genuine issues of material fact as to whether Jones violated the Fourth Amendment rights of Rodney.

III. Whether the trial court erred in finding that Jones' use of force in this case complied with substantive due process under the Fourteenth Amendment.

IV. Whether the doctrine of qualified immunity applies in relation to Jones.

V. Whether a civil rights action under 42 U.S.C. § 1983 can be maintained against the Sheriff's Department.

VI. Whether law enforcement immunity applies as to all of the state law claims against Jones and the Sheriff's Department.

### Facts and Procedural History

Jones is a black police officer who worked for the Marion County Sheriff's Department. He was off-duty on the evening of May 12, 1982. At approximately 9:50 p.m., his mother-in-law was on the telephone with his wife, Lynn, when she indicated someone was trying to break into her house. Jones grabbed his badge and revolvers, and drove to the scene (which took "anywhere between 45 seconds to one minute," as they lived only 3 blocks away).

Jones pulled into the driveway and left his headlights on. He stepped out of his car and observed a black male sitting on the step right outside the door of his in-law's house pushing his left hand into the screen. Jones noticed the intruder, Rodney, was "reaching in, trying to open the door." At this point, the father-in-law, Jay Smith, came out the front door and pointed at Rodney sitting near the doorway in the porch. Jones told him to call the police and advise them that a deputy needed assistance.

The record shows the basic layout of the area in question to be as follows: (1) the property contains a driveway, garage, screened-in porch, fenced-in yard, and house; (2) the screened-in porch is between the garage and the house; (3) the house is next to, and not behind, the garage; (4) there is a side door to the garage directly across from the screen door to the porch; (5) the side door to the house can be entered through the porch; and (6) there is a narrow walkway between the garage door and the porch door. We also note that part of the fence apparently extended across the gap between the front of the garage and the front of porch or house.

As the large overhead garage door was open, Jones decided to approach Rodney through the garage. Once in the garage, Jones opened the garage's side door and had a clear view of Rodney. At his deposition, Jones stated that he next identified himself as a police officer and told Rodney to leave the property; but he was ignored. Jones then asked Rodney why he was trying to break into the house, and Rodney stated that "[y]ou don't know who the fuck I am." Jones states that he had his revolver in his right hand, "down to my side," at this point.

During this interchange, Jones states that he was standing just to the right of the garage doorway having stepped through it and onto the narrow walkway between the garage and porch. Jones was approximately two and one half (2½) feet from Rodney at this point. Jones states that he identified himself for a third time (as a police officer) and repeatedly instructed Rodney, in a loud voice, to leave the property. Rodney stated "[he] didn't give a fuck," and was "getting in this house." Rodney's tone of voice was loud, his speech was not clear, and his words were slurred.

Up until this point, Rodney remained in a "crouched" position near the porch door. Shortly before, he had switched hands and was now using his right hand on the screen. Jones states he could no longer

see the left hand, which was now behind Rodney.

Shortly thereafter, the Smith's dog came from the backyard and ran between Jones and Rodney. Jones states that Rodney kicked the dog, which fell against Jones' right leg and then "bolted" through the open side garage door and out to the driveway. Jones states that Rodney used this distraction to "snatch his hands out and to sw[i]ng at [Jones] with his right hand"; and that it was "a simultaneous swing and lunge." Jones raised his gun and fired a single shot as he stepped backwards to avoid the attack. Jones saw that the bullet had struck Rodney in the right hand, and, as the hand had already passed in front of Rodney's body during the swing, the impact spun Rodney around so that his right hand hit the screen where the hand had been previously. The bullet went through the screen approximately where the hand had been before, and blood and skin were lodged there in the screen.

Jones states that Rodney then looked at his injured hand and stated, "[y]ou think you're bad, mother fucker," along with, "I am going to kill your ass." Rodney then propelled himself off of "where he was leaning" and he "lunged" at Jones. Jones fired "two or three" times, and Rodney then fell through the side door of the garage. Rodney was struck three (3) times in the face: one bullet entered below the right eye next to the nose; another struck his upper lip; and the third entered his mouth. Two spent bullets were later recovered from Rodney's pharynx, and fragments of another were found in the mouth and stomach. Rodney never regained consciousness and died seven (7) days later.

Robert N. Stowers ("Stowers") was visiting his mother-in-law (who lives behind the Smiths) at the time of the incident. He heard loud voices and what sounded like gunshots, as follows:

> [T]hen all of a sudden I heard some more noise so I went to the back window ... and heard what sounded like a gunshot. And I said, "[w]hat is this? I'm not going to put up with this all night." Then I heard someone say "Stop. Get

away from there." Then I heard three more gunshots ...

> \* \* \* \* \* \*

> There were I guess three different voices that I heard. One voice was saying, "No. Get away from the door. If you don't get away I'm going to call the police." And another was saying, "Open this door. Open this damn door." Lots of profanity. I was trying to figure out what was going on out there, and my mother-in-law said "[p]robably somebody drunk and trying to get in their house," so we played it off. Then I heard a different voice which said, "Stop. Get away from there." And that's when I heard the three shots together.

Also, Jay Smith testified that he saw Rodney jump over the fence in his backyard. Rodney then proceeded to call Smith "bad language about open that door, blasted, blasted, get me through, I want to get in, I want to get out of here."

Shortly before the incident, the record indicates Rodney had been involved in an automobile accident in the neighborhood. The record also indicates that he was undergoing treatment at the time for an alcohol problem and was taking the drug Antabuse.

The Slays filed their Complaint on May 3, 1983. Nothing was done in the case for four (4) years. In January, 1989, the Slays filed their four (4)–count Amended Complaint for Damages, alleging that: (1) the "shooting was without legal provocation or cause, in the course of discriminatory enforcement of policies and regulations concerning the 'use of force' by policemen of the City of Indianapolis and Marion County Sheriff's Department"; (2) the Slays "have been deprived of [Rodney's] love and affection, and the normal services of a child"; (3) Deputy Jones' actions "directly violated the civil rights of Rodney as guaranteed by the Fourth, Sixth and Fourteenth Amendments of the Constitution of the United States of America; and Article I, Section I, [and] Article I, Section 2, and Article I, Section 15, of the Constitution of the State of Indiana"; and (4) Deputy Jones, "acting under color of state law in his official ca-

pacity ... willfully and wantonly shot Rodney without any legal justification depriving him of his life and liberty without due process," in violation of the Fourth, Fifth and Fourteenth Amendments.[1]

On January 31, 1991, the Appellees filed their Motion for Summary Judgment. The trial court held a hearing, and granted the Motion on June 12, 1991. The court's Order states, in part, as follows:

As to Count I, from the evidence properly before the Court having probative value, there is no genuine issue of material fact as to whether the use of deadly force by [Jones] violated [Rodney's] [d]ue [p]rocess [r]ights under the Fifth or Fourteenth Amendments of the United States Constitution. It did not. From the evidence before the Court there is no material fact indicating Jones was attempting to effectuate an arrest or otherwise intentionally gain control over Rodney when firing his weapon. As a result, Fourth Amendment analysis is inapplicable. Furthermore, it is apparent that Jones' use of force complied with substantive due process as set out in *Rochin v. California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183] (1952), and its progeny.

This Court is aware of judicial decisions applying Fourth Amendment analysis to cases arising from a police officer's use of force. This Court has therefore also undertaken an extensive analysis of the facts as presented to the Court by the relevant evidence under Fourth Amendment theory. Assuming that the use of force was undertaken to effectuate the arrest or control of Jones [sic] in order to prevent Jones [sic] from fleeing, the use of force, or seizure, was still objectively reasonable under the facts presented to Jones. Finally, it is apparent that Jones' actions violated no clearly established constitutional right of Rodney as those rights existed on or about May 12, 1982, which was prior to the

Supreme Court's decision in *Tennessee v. Garner*, 471 U.S. 1 [105 S.Ct. 1694, 85 L.Ed.2d 1] (1985), and as such, Jones is entitled to qualified immunity for his acts and/or omissions.

As to Count II, it is first apparent that since the [Slays] suffered no constitutional violation, as a matter of law no custom, practice, or policy could have proximately caused their constitutional rights to be violated. Additionally, there is no material fact in dispute based upon the evidence properly before the Court and having probative weight supporting [the Slays'] claim that a custom, practice or policy of the [Sheriff's Department] caused a deprivation of the [Slays'] constitutional rights.

Count III of the Second Amended Complaint for Damages incorporates the factual allegations of Counts I and II by reference and includes a new element of damages. By way of incorporation, this Court also incorporates by reference its rationales for granting [s]ummary [j]udgment as to Counts I and II in regard to Count III.

In regard to Counts IV and V, which are state law claims, all of the Defendants are entitled to law enforcement immunity pursuant to I.C. § 34-4-16.-5(3)(7) [sic]. It is not disputed by those material facts properly before the Court and having probative value that Defendant Jones was enforcing a law at the time of the incident. It is further not disputed by those material facts properly before the Court and having probative value that Jones did not effectuate a false arrest or imprisonment of Rodney Harding Slay during this incident.

### *Discussion*

#### I

■ We first address the issue of jurisdiction. The Appellees argue that "this [C]ourt lacks subject matter [jurisdiction]

---

1. We note the pertinent language of 42 U.S.C. § 1983, as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to be deprived of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

to hear this appeal ... [because] the [Slays] failed to timely file a praecipe pursuant to Ind.Appellate Rule 2(A) ... within thirty (30) days after the [trial] court denied their Motion to Correct Error." Therefore, they argue that this case should be dismissed on jurisdictional grounds. We disagree.

Of course, the right to appeal is forfeited where a party fails to comply with the requirements of Appellate Rule 2(A), as follows:

> **(A) Initiation of the Appeal.** An appeal is initiated by filing with the clerk of the trial court a praecipe designating what is to be included in the record of the proceedings. The praecipe shall be filed within thirty (30) days after the entry of a final judgment or an appealable final order or, if a motion to correct error is filed, within thirty (30) days after the court's ruling on such motion, or thirty (30) days after the motion is deemed denied under Trial Rule 53.3 ... Unless the praecipe is filed within such time period, the right to appeal will be forfeited ...

*See also, Hughes v. County of Morgan* (1983), Ind.App., 452 N.E.2d 447 (failure to file praecipe within required time will result in dismissal of the appeal).

Here, the Slays filed their Motion to Correct Errors on July 10, 1991; it was denied two weeks later on July 22, 1991. However, contrary to the docket sheet, the entry or order denying the motion was *not* sent to counsel of record until November 14, 1991. As noted by defense counsel R.M. Gholston in a letter to the Slays' counsel:

> On July 22, 1991, Judge Curry signed an Order wherein he denied your Motion to Correct Error. For some reason or another, the Order sat in the file all this time, and never got distributed to counsel. Yesterday, one of the Deputy Clerks gave me all five copies and asked that I see that copies were distributed to all counsel. You will, therefore, find enclosed three copies, one for you, one for

Jonathan Gotkin and one for Jeffrey Linder ...

Further, in their Motion for Leave to File Belated Praecipe and Notice of Appeal and Request to Correct the Record,[2] the Slays attached an affidavit from *opposing* counsel stating that he, like the Slays, did not receive a copy of the Order denying the Motion to Correct Errors until November 14, 1991. The trial court then granted leave to file a belated praecipe, and also corrected the record to reflect that notice of its ruling was not sent to counsel on July 22, 1991.

■ Therefore, it is undisputed that the clerk wholly failed to send copies of the trial court's ruling to counsel of record. Such is required by T.R. 72(D), which states:

> **(D) Notice of Orders or Judgments.** Immediately upon the entry of a ruling upon a motion, an order or judgment, the clerk shall serve a copy of the entry by mail in the manner provided for in Rule 5 upon each party who is not in default for failure to appear and shall make a record of such mailing ...

As our supreme court noted in *State ex rel. Marich v. Lake Superior Court* (1980), 273 Ind. 590, 407 N.E.2d 233, 234, the clerk is under a *duty* pursuant to T.R. 72(D) to send notice of trial court orders to parties, and to memorialize such action on the court's order book or docket. Further, while counsel have a general duty to regularly check the court records and monitor the progress of pending cases, they are entitled to rely upon notification by the clerk pursuant to T.R. 72(D). *M & J Services, Inc. v. VMK, Inc.* (1990), Ind.App., 561 N.E.2d 827, 829. Indeed, we have also held that lack of notice alone is adequate grounds for the granting of equitable relief. *Id.; Allstate Insurance Co. v. Neumann* (1982), Ind.App., 435 N.E.2d 591.

■ The facts and circumstances of this case support the trial court's granting of equitable relief to the Slays. Further, the law is well-settled that "[w]here the record

---

**2.** The Slays filed their original Praecipe on September 9, 1991. This appears to have been filed pursuant to Ind.Trial Rule 53.3, which states

that a motion to correct error "shall be deemed denied" if the trial court fails to rule on such motion within 45 days after it was filed.

reasonably permits, we prefer to dispose of appeals on their merits." *Swain v. Swain* (1991), Ind.App., 565 N.E.2d 1134, 1135. Accordingly, this Court has jurisdiction to hear and decide this appeal.

## II

■■■ The Slays argue that there are genuine issues of material fact as to whether Jones violated the Fourth Amendment rights of Rodney. We agree.[3]

■■■ Of course, this is an appeal from a summary judgment, and our standard of review is well-established: whether there were no genuine issues of material fact and whether the moving party was entitled to judgment as a matter of law. *American States Insurance Co. v. Adair Industries, Inc.* (1991), Ind.App., 576 N.E.2d 1272, 1273. Thus, we stand in the position of the trial court and consider the same matters. *Campbell v. Porter County Board of Commissioners* (1991), Ind.App., 565 N.E.2d 1164, 1166. We may consider the pleadings, affidavits, admissions, depositions, interrogatories and testimony. *McCutchan Estates Corp. v. Evansville– Vanderburgh County Airport Authority* (1991), Ind.App., 580 N.E.2d 339, 341. All evidence must be construed in favor of the non-movant, and all doubts as to the existence of a material issue must be resolved against the movant. Even if facts are not in dispute, summary judgment is inappropriate if conflicting inferences arise. *Rogers v. Lewton* (1991), Ind.App., 570 N.E.2d 133, 134. A fact is "material" for summary judgment purposes if it helps to prove or disprove an essential element of plaintiff's cause of action. *Id.*

■■■ Therefore, to determine whether the Slays have established a genuine issue of material fact for trial, we must set forth the legal requirements that govern her claim. To collect damages under 42 U.S.C. § 1983, the Slays must show that Jones violated their son's Fourth Amendment right to be free from unreasonable searches and seizures (which has been applied to the states and municipalities through the Fourteenth Amendment).[4] *See, Smith v. Freland* (6th Cir.1992), 954 F.2d 343, 345. As the United States Supreme Court has stated, "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor* (1989), 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443. The proper standard for this inquiry is as follows:

> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight ... [T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

*Id.*, 490 U.S. at 396, 109 S.Ct. at 1871.

■■■ Further, we consider the totality of the facts and circumstances known to the officer at the time of his actions in determining whether those actions were "objec-

---

**3.** This case involves federal and state law claims. The law is well-settled that state courts have concurrent jurisdiction over civil rights cases brought under § 1983. *Maine v. Thiboutot* (1980), 448 U.S. 1, 10, 100 S.Ct. 2502, 2507, 65 L.Ed.2d 555. We also note that federal substantive law controls, and any state laws or rules which inhibit the prosecution of a § 1983 action are preempted by the Supremacy Clause of the United States Constitution. *Felder v. Casey* (1988), 487 U.S. 131, 139, 108 S.Ct. 2302, 2307, 101 L.Ed.2d 123.

**4.** We note here that Jones' use of deadly force against Rodney was a "seizure" under the Fourth Amendment. *Tennessee v. Garner* (1985), 471 U.S. 1, 7–8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1. "[W]hether the application of deadly force is for the purpose of effectuating an arrest or other stop, or for the purpose of self-defense, it is an acquisition of physical control by a law enforcement official that implicates the victim's fourth amendment interest to be free from unreasonable seizures." *Reed v. Hoy* (9th Cir. 1989), 891 F.2d 1421, 1426.

tively reasonable." *Ford v. Childers* (7th Cir.1988), 855 F.2d 1271, 1276. While the use of deadly force is unreasonable if intended to merely prevent a felon's escape, *Tennessee v. Garner* (1985), 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1, "such force is reasonable if, based on the facts and circumstances that are known to the officer at the time, the officer has 'probable cause' to believe the suspect poses a threat of serious physical harm to the officer or to others." *Ford*, 855 F.2d at 1274.

Applying these standards, we cannot conclude, as a matter of law, that the shooting was objectively reasonable. There are material issues of fact as to how the shooting occurred. While Jones contends he shot Rodney in the hand when Rodney lunged and swung at him (which shot caused Rodney's hand to land back where it had been previously on the screen), there is evidence which supports an inference that the shooting may not have occurred this way. The evidence includes the skin and blood lodged in the screen where the bullet hole is located. A reasonable inference would be that the hand was *on* the screen when the bullet went through it. Further, the testimony of Stowers (the person behind the Smith's house) supports such inference in that he heard one shot, went outside, heard someone state "[s]top, [g]et away from there," and then he heard three more shots. Jones did not state at his deposition that he provided any type of warning between the first and following three shots. A reasonable inference from this evidence is that Jones may have approached Rodney; without warning, shot his right hand while it was on the screen; and then warned Rodney to "[s]top, [g]et away from there," before firing the final three shots.[5]

The Slays allege there are other issues of material fact; however, we have reviewed the record and disagree. They cite to a minor inconsistency in one of Jones' four statements regarding which hand Rodney used to swing at Jones. During his grand jury testimony, Jones indicated that Rod-

ney swung with his left hand. However, in every other statement (before and after the statement in question), Jones indicated that it was the right hand. Also, the evidence indicates, and the parties do not dispute, that the right hand was the one that was shot.

The Slays next argue that the lack of powder burns on the right hand indicate that Rodney could not have been within a few feet of Jones when the shooting occurred (as Jones contends). However, the Slays did not present any evidence as to the minimum or maximum distance for powder burns on flesh to occur from a gun like the one used by Jones. Accordingly, this does not present a material issue of fact.

The Slays next argue that the autopsy report indicates one bullet entered the head at a 45 degree downward angle, suggesting that Rodney was not lunging toward Jones. However, if he were in fact lunging, Rodney's head would have naturally been tilted down in relation to Jones. Any inference from such evidence would be "shaky" at best, and insufficient to withstand summary judgment. *See, Maiorana v. McDonald* (1st Cir.1979), 596 F.2d 1072, 1081 (fact that bullet entered under armpit is "shaky inference" that the victim's arms were raised for police, and not sufficient to create an issue of material fact).

The Slays also argue there are material fact issues as to "why the shooting happened." They cite Jones' statements regarding why he believed Rodney may have had a weapon, and claim that his statements are conflicting. In particular, they state "even though Jones' [sic] states that he 'could see his [Rodney's] rear end pretty good,' suggesting that Jones had a clear view of Rodney's rear jeans pockets, Jones claims that he still thought that Rodney had a weapon—even though Jones stated that 'I didn't see a weapon then.'" We have reviewed the testimony, and do not agree that these statements are conflicting.

---

**5.** This inference is sufficient to resist summary judgment; however, it would have been stronger if the Slays had timely filed the affidavit of their expert, Dr. John Pless. The trial court properly excluded this affidavit because it was not filed until *after* the entry of summary judgment, and did not constitute newly discovered evidence for purposes of T.R. 59.

In addition, the Slays argue that there is testimony that "directly conflicts" with respect to whether Jones participated in the police investigation of the shooting. They cite testimony by Rodney's mother that she observed Jones and another officer "picking something out of the wall" at the scene, along with the testimony by Jones that he did not "actively" participate in the investigation. They conclude from these statements that "either Deputy Jones or Mrs. Slay is lying." This conclusion is wholly without merit. The fact that Jones was talking with an officer and they appeared to have found something at the scene does not mean Jones was *actively* involved in the police investigation.

### III

The Slays next argue that the trial court erred in determining that there had been no violation of Rodney's rights under the Fourteenth Amendment. We agree.

 We first note the distinction between the protection that is afforded by the Fourth and Fourteenth Amendments. As we have noted previously, the Fourth Amendment protects against unreasonable conduct. *Tennessee*, 471 U.S. at 6, 105 S.Ct. at 1699. On the other hand, the Fourteenth Amendment protects against egregious conduct. *See, Rochin v. California* (1952), 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183. In *Rochin*, the Supreme Court stated that conduct that "shocks the conscience" violates the due process clause of the Fourteenth Amendment. In addition, the following factors may be considered:

(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; and (4) whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Johnson v. Glick* (2nd Cir.1973), 481 F.2d 1028, 1033.

Thus, because there are material issues of fact as to how the shooting occurred, the trial court erred in determining that "Jones' use of force complied with substantive due process as set out in *Rochin*."

### IV

 We next address the issue of qualified immunity. A defendant is entitled to this immunity if the constitutional right in question was not clearly established in relation to the facts confronting the defendant at the time he took his action. *See, Anderson v. Creighton* (1987), 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523. The test is "whether the law was clear in relation to the specific facts confronting the public official when he acted." *Rakovich v. Wade* (7th Cir.1988), 850 F.2d 1180, 1209. "Before a right is 'clearly established' it must be 'sufficiently particularized to put the potential defendants on notice that their conduct is unlawful.'" *Azeez v. Fairman* (7th Cir.1986), 795 F.2d 1296, 1301. The qualified immunity doctrine was discussed in *Harlow v. Fitzgerald* (1982), 457 U.S. 800, 817–818, 102 S.Ct. 2727, 2737–2738, 73 L.Ed.2d 396, as follows:

[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

[Citations omitted.]

 Therefore, the test raises two questions here: (1) what are the "clearly established rights" allegedly violated; and (2) was the conduct "objectively reasonable." These are questions of law for determination by the court, not the jury. *See, Alvarado v. Picur* (7th Cir.1988), 859 F.2d 448, 451. As noted in *Hughes v. Meyer* (7th Cir.1989), 880 F.2d 967, 971, "even though pertinent facts may be in dispute, the question of whether immunity attaches is always one for the judge to decide."

 Jones argues that he is entitled to qualified immunity.[6] In particular, he con-

---

**6.** A municipality has no qualified immunity de-

fense. *Owen v. City of Independence* (1980), 445

tends that the rights in question were not "clearly established" when the shooting occurred, in May of 1982. While *Tennessee v. Garner, supra,* further elaborated on the right against unreasonable searches and seizures, the right was sufficiently particularized at the time of the shooting to put Jones on notice that excessive force was unlawful. Furthermore, there are material issues of fact regarding how the shooting occurred; therefore, we cannot determine, as a matter of law, that Jones' conduct was "objectively reasonable" for qualified immunity.

### V

 We next address the issue of whether a civil rights action can be maintained against the Marion County Sheriff's Department. In the case of *Rhodes v. McDannel* (6th Cir.1991), 945 F.2d 117, 120, the court determined that the sheriff's department was not a legal entity subject to suit under § 1983. In *Jones v. Bowman* (N.D.Ind.1988), 694 F.Supp. 538, 544, the court stated:

> Defendants claim the Sheriff's Department cannot be sued because it has no separate corporate existence. A city's police department is merely a vehicle through which the city government fulfills its policy functions and is not a proper party defendant. The court can find no reason why the same conclusion would not apply to a county sheriff's department. Accordingly, the defendant Office of the Sheriff of Elkhart County is entitled to judgment as a matter of law.

Therefore, we must affirm the summary judgment in favor of the Sheriff's Department as to any claim against it under § 1983.

### VI

Finally, the Slays argue the trial court erred in finding that Jones and the Sheriff's Department were entitled to law enforcement immunity pursuant to Ind.Code § 34-4-16.5-3(7), which states:

A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from:

\* \* \* \* \* \*

> (7) the adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment;

 We agree with the Slays. Deputy Jones claims that he was failing to enforce a law, and not arresting Rodney, when he told Rodney to leave the premises; thus, he is protected by immunity. We note the law is well-settled that "[n]either a police officer nor a governmental unit is liable for failure to enforce a law," *Klobuchar v. Purdue University* (1990), Ind.App., 553 N.E.2d 169, 173. However, an officer who responds to a call for assistance, confronts an individual who appears to be violating the law, and then shoots that individual, cannot logically be considered as "failing to enforce a law."

 Furthermore, because Deputy Jones contends he was not in the process of arresting Rodney, there is no immunity for Jones. In *City of Wakarusa v. Holdeman* (1991), Ind., 582 N.E.2d 802, our supreme court stated that "unless the injuries for which a plaintiff seeks recovery arose out of the actual attempts to effect an arrest of one who may have broken the law, there is no immunity to be found in Section 3(7)."

Affirm in part, Reverse in part.

SHARPNACK, C.J., and RUCKER, J., concurring.

U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673, *reh. denied* 446 U.S. 993, 100 S.Ct. 2979, 64 L.Ed.2d 850; *Hedge v. County of Tippecanoe* (7th Cir.1989), 890 F.2d 4.